Thomas C. BOWLING, Appellant,

v.

LEXINGTON–FAYETTE URBAN
COUNTY GOVERNMENT,
Appellee,

and

Honorable Gregory D. STUMBO, At-
torney General, Commonwealth of
Kentucky Intervening Appellee

No. 2004–SC–0907–MR.

Supreme Court of Kentucky.

June 16, 2005.

Rehearing Denied Oct. 20, 2005.

Susan Jackson Balliet, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Elizabeth Stovall, Louisville, Counsel for Appellant.

Glenda D. Humphrey, Lexington–Fayette Urban County Government, Department of Law, Lexington, Counsel for Appellee Lexington–Fayette Urban County Government.

David A. Smith, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, Counsel for Intervening Appellee Honorable Gregory D. Stumbo, Attorney General, Commonwealth of Kentucky.

Opinion of the Court by Justice COOPER.

This appeal stems from the dismissal of an action filed in the Fayette Circuit Court by Appellant, Thomas C. Bowling, pursuant to the Open Records Act, KRS 61.870 to KRS 61.884. Appellant's complaint alleged that the Lexington–Fayette Urban County Government (LFUCG) wrongfully withheld records after he made a series of open records requests. On appeal, he claims that the trial court erred by 1) canceling an evidentiary hearing and quashing the subpoenas issued for representatives of the Fayette County Commonwealth's Attorney's office and the Kentucky Attorney General's office; and 2) finding that the LFUCG had not willfully violated the Open Records Act.

In 1990, a Fayette Circuit Court jury convicted Appellant of two counts of murder and one count of assault in the fourth degree and sentenced him to death for the murders of Edward Lee and Ernestine Lynn Earley. His convictions and sentences were affirmed on direct appeal. *Bowling v. Commonwealth,* 873 S.W.2d 175 (Ky.1993), *cert. denied, Bowling v. Kentucky,* 513 U.S. 862, 115 S.Ct. 176, 130 L.Ed.2d 112 (1994). His Criminal Rule (RCr) 11.42 motion was overruled and that decision was affirmed on appeal. *Bowling*

*v. Commonwealth,* 981 S.W.2d 545 (Ky. 1998), *cert. denied, Bowling v. Kentucky,* 527 U.S. 1026, 119 S.Ct. 2375, 144 L.Ed.2d 778 (1999). Appellant's final normal avenue of appeal from his conviction was exhausted when the United States Supreme Court denied his petition for certiorari seeking review of the denial of his writ of habeas corpus. *Bowling v. Parker,* 138 F.Supp.2d 821 (E.D.Ky.2001), *aff'd, Bowling v. Parker,* 344 F.3d 487 (6th Cir.2003), *cert. denied sub nom., Bowling v. Haeberlin,* —— U.S. ——, 125 S.Ct. 281, 160 L.Ed.2d 68 (2004). The Governor of Kentucky signed a death warrant scheduling Appellant's execution for November 30, 2004. KRS 431.240(4). Appellant subsequently filed various motions and separate actions challenging his sentence of death. *E.g., Bowling v. Commonwealth,* 163 S.W.3d 361, 364 (2005). Both this Court and the Franklin Circuit Court issued orders staying Appellant's execution pending the resolution of these matters.

Appellant theorizes that either Donald or John Ed Adams, alleged members of the "Adams family" that Appellant characterizes as a Lexington-based drug and theft cartel, killed the Earleys in retaliation for Edward Earley's having informed the police about the family's criminal activities. He also theorizes that a member of the Adams family was having an affair with Ernestine Earley. According to Appellant, members of the Adams family "framed" him by arranging for him to purchase the murder weapon the week before the crime, getting him drunk, and—without his knowledge—borrowing his car, his jacket, and his hat, and then murdering the Earleys with his pistol while driving his car and wearing his clothes. Nothing in the record of Appellant's criminal convictions supports these theories; thus, he seeks such support in the records of the Lexington Police Department (LPD), an agency of the LFUCG.

On October 14, 1999, Appellant sent an open records request seeking all files within the custody of the Lexington Police Department pertaining to the Earley homicide investigation, any investigation of Appellant, himself, whether pertaining to the Earley homicides or not, and any investigation resulting from information provided to the police by Edward Earley. On October 19, 1999, the LFUCG temporarily denied Appellant's request, based on its interpretation of *Skaggs v. Redford,* 844 S.W.2d 389 (Ky.1992), that police investigation files relating to a criminal defendant were exempt from public inspection until after the defendant served his sentence. The LFUCG noted that the denial was temporary, however, pending its decision on whether to appeal two Attorney General opinions in separate cases that held its reliance on *Skaggs* for this proposition to be misplaced.

Appellant responded on October 27, 1999, clarifying and renewing his request with respect to the files to which the LFUCG's interpretation of *Skaggs* did not apply. Appellant additionally requested any files pertaining to Donald R. Adams, indicating that Adams might also be known as Donald L. Adams. On November 3, 1999, the LFUCG informed Appellant that it had decided not to appeal the Attorney General opinions and that it would provide some of the files that were the subject of the open records request. Specifically, the LFUCG agreed to provide Appellant's homicide investigation file but, because of its voluminous nature and the fact that the file had previously been made available to Appellant in 1995, requested that Appellant furnish a list of the materials from the file that were already in his possession. The LFUCG also agreed to provide all other files pertaining to Appellant and the files specifically pertaining to Edward Earley as an informant, and un-

dertook to begin the location and review of those records. Finally, the LFUCG agreed to provide investigative files pertaining to Adams, but claimed that such records generated after April 9, 1990, the date the Earleys were killed, were exempt from Appellant's disclosure request as part of an ongoing investigation,[1] pursuant to KRS 61.878(1)(h) and KRS 17.150(2).

After sending an investigator to view the documents provided by the LFUCG, Appellant issued another open records request on November 15, 1999, seeking all LPD investigative files pertaining to Donald Ray Adams, Edward Earley, Ernestine Earley and Lynwood Clay Brackett. On November 17, 1999, the LFUCG granted Appellant access to the entire investigative file relating to Edward and Ernestine Earley with the exception of information for which it claimed a statutory exemption from disclosure. KRS 61.880(1); 61.878(4). Accordingly, Appellant's investigator examined and copied files pertaining to the Earley homicide investigation on December 17, 1999. Appellant continued to correspond with the LFUCG over the next several months regarding the remaining subjects of his November 15, 1999, open records request, i.e., files pertaining to Donald Ray Adams, Lynwood Clay Brackett, and drug intelligence information provided to the police by Edward Earley. During this time, according to the LFUCG's letter to Appellant of June 23, 2000, the files were inadvertently sent back to the LPD, where they were misfiled for a period of time. In June 2000, Appellant issued another open records request, seeking narcotics and investigation files from 1988–1991 pertaining to David Adams, Donald L. Adams, Donald R. Adams, Edward and Ernestine Earley,

and George King, as well as the case file on the October 13, 1989, arrest of Donald Adams.

After receiving the June 2000 request, corporate counsel for the LFUCG contacted the Fayette County Commonwealth's Attorney's office and the Kentucky Attorney General's office. Based on this discussion, the LFUCG notified Appellant on June 23, 2000, that because of his pending action in federal court for a writ of habeas corpus, all police documents were exempt from inspection, pursuant to KRS 61.878(1)(h). Further, the LFUCG denied each of Appellant's remaining requests because they mirrored discovery requests that the United States District Court for the Eastern District of Kentucky had denied on May 19, 2000. Appellant responded on June 28, 2000, pointing out the lack of legal authority for the proposition that the denial of a request for a discovery order affects the propriety of an open records request, and pointing out that KRS 61.878(1)(h) exempted only those files directly related to the prosecution of Appellant for the Earley homicides. After considering Appellant's arguments, the LFUCG determined that the federal discovery order did not apply to the open records requests and granted Appellant's requests with regard to all records that were not otherwise exempt from public inspection.

On July 26, 2000, the LFUCG made files available in response to Appellant's June 2000 request for receipt of information (ROI) records relating to David Adams, Donald L. Adams, Donald R. Adams, the Earleys, and George King, as well as the file concerning Donald Adams's 1989 ar-

---

**1.** This claim was based upon a memorandum issued on November 2, 1999, by Captain John Jacobs of the LPD, who conducted a review of Appellant's request and the LPD's crime intel-

ligence files and concluded that the information dated after the Earley homicides was "sensitive and would impair current investigations if released."

rest. It informed Appellant that the LPD had located ROI records for David Adams, Donald R. Adams, Jr., and George King, but was unable to find any ROI files for the other individuals. The LFUCG also noted that ROI reports were routinely purged after five years pursuant to LPD policy, unless they had become part of an active police investigation. On July 28, 2000, Appellant confirmed the receipt of the located ROI records and the arrest file. Appellant also requested copies of an additional police file and of audio and videotapes of an interview with Donnie Adams.

On August 21, 2000, the LFUCG again wrote Appellant, stating that copies of the documents in Appellant's police investigation file would be available for pickup and identifying the portions of the file that were being withheld and the statutory bases for their exemption. The LFUCG also responded to Appellant's request for a videotape and audiotapes that were recorded during the Earley homicide investigation. Appellant was informed that the LPD had located seven of seventeen audiotapes, that the remaining ten audiotapes were in the possession of the Commonwealth's Attorney's office, and that the LPD was unable to locate the videotape. The LFUCG advised Appellant that it would review the seven audiotapes before making them available to Appellant to ensure they contained no information that was exempt from disclosure.

Three months later, Appellant still had not received a response regarding the audiotapes, and the LFUCG continued to claim the ongoing investigation exemption, KRS 61.878(1)(h), for files pertaining to Donald Adams generated after the Earley homicides. Accordingly, on November 22, 2000, Appellant filed this action in the Fayette Circuit Court, alleging violations of the Open Records Act. KRS 61.882.

Appellant also sought an evidentiary hearing, pursuant to KRS 61.882(4). It appears that the LFUCG received a courtesy copy of Appellant's complaint before it was filed. In response, on November 20, 2000, the LFUCG granted Appellant access to the seven audiotapes in its possession.

Appellant's attorney met with Lexington Police Chief Larry Walsh on March 8, 2001. During this meeting, Walsh stated that he had written two internal police memoranda regarding Donald R. Adams, Sr., and Edward Earley concerning Adams's drug dealing activities and the possibility of Adams being a suspect in the Earley homicide investigation. Because these two documents were not contained in the Earley homicide investigation file when it was forwarded to the LFUCG Department of Law in response to Appellant's 1995 and 1999 open records requests, Appellant filed an open records request for these memoranda on March 21, 2001. Based on Walsh's estimates of when he prepared the memoranda, the LFUCG Department of Law obtained two computer disks containing documents Walsh dictated between January and November 1990. A search of these disks did not reveal the documents Appellant sought, and the LFUCG found only one memorandum mentioning Donald Adams, which it produced to Appellant on May 4, 2001. On March 22, 2001, Appellant issued another open records request for all records pertaining to Donald Ray Adams, Donald Leroy Adams, Edward Earley, and David Paul Adams.

On May 11, 2001, the Fayette Circuit Court ordered the LFUCG to provide Appellant with "all Lexington Police Department records pertaining to anyone named Donald Adams (regardless of middle name or other identifying information) that were generated during the period of time on or before April 10, 1991, to April 10, 1996."

The court also ordered the LFUCG to produce the Donald Adams records generated after April 10, 1996, for *in camera* inspection. The court set an evidentiary hearing on Appellant's claims for June 4, 2001. On May 18, 2001, the LFUCG released its files regarding Donald Adams to Appellant, listed the statutory bases for eight withheld files, and noted that the withheld files would be given to the Fayette Circuit Court for *in camera* review.[2] After concluding its *in camera* review, the court ordered the LFUCG to release five of the eight withheld files to Appellant.

Appellant sought to utilize the hearing scheduled for June 4, 2001, to establish the existence of additional records that had not been furnished to him by the LFUCG. Before Appellant began calling witnesses, however, the trial court determined that an evidentiary hearing was premature and directed Appellant to take affidavits from each of the witnesses he planned to call. Appellant also sought to establish whether and when the ten remaining audiotapes and the videotape in question came into the possession of the Fayette County Commonwealth's Attorney's office. To this end, he subpoenaed two members of the Commonwealth's Attorney's office and one member of the Kentucky Attorney General's office to testify about the "missing" tapes. The trial court quashed the subpoenas and cancelled the hearing.

On July 8, 2002, Appellant filed a motion to reconsider the court's rulings, attaching several affidavits from current and former LPD employees, numerous police reports, and newspaper articles, in an attempt to establish the existence of further, undisclosed records. The trial court overruled

this motion. Finally, on September 23, 2004, the court found that the LFUCG had not violated the Open Records Act and dismissed Appellant's action.

Based on these events, Appellant claims that the trial court erred in canceling the evidentiary hearing. He argues the hearing could have proven the existence of numerous records that the LFUCG continues to withhold from him. He requests that this Court order the LFUCG to release all such documents, or alternatively, that his case be remanded for an evidentiary hearing, at which he will continue to attempt to prove the existence of such records. Appellant also requests this Court to order the LFUCG to obtain the tapes in the possession of the Fayette County Commonwealth's Attorney's office and release copies to him. Finally, Appellant requests that this Court hold that the trial court erred in finding that the LFUCG did not willfully violate the Open Records Act.

## I. DENIAL OF HEARING.

The basic premise of the Open Records Act is that:

All public records shall be open for inspection by any person, except as otherwise provided by KRS 61.870 to 61.884, and suitable facilities shall be made available by each public agency for the exercise of this right.

KRS 61.872(1).

Each public agency, upon any request for records made under KRS 61.870 to 61.884, shall ... notify in writing the person making the request, within the

2. From the correspondence between the LFUCG and Appellant's attorneys, it appears that at this time, the LFUCG also released files relating to Adams and generated after April 10, 1996. The LFUCG's action was based upon a May 11, 2001 memorandum issued by Captain John Jacobs. According to Jacobs, the LPD had previously engaged in a preliminary investigation, but a formal investigation never commenced due to a lack of credible information.

three (3) day period, of its decision. An agency response denying, in whole or in part, inspection of any record shall include a statement of the specific exception authorizing the withholding of the record and a brief explanation of how the exception applies to the record withheld.

KRS 61.880(1). The enforcement mechanism for the Act provides that the requester may forward the agency's denial to the Attorney General for further review. The requester also has the option of immediately filing an enforcement action in Circuit Court. KRS 61.882(1), (2). Clearly, the Act contemplates that the court may hold a hearing, if necessary. KRS 61.882(4) ("[P]roceedings arising under this section ... shall be assigned for hearing and trial at the earliest practicable date."). The parties may also request the court to review any withheld records *in camera*, and the burden of proof for establishing that a withheld record is exempt lies with the public agency. KRS 61.882(3).

### A.  Quashing of Subpoenas.

██ Appellant claims that the trial court erred in quashing the subpoenas issued to representatives of the Fayette County Commonwealth's Attorney's Office and the Kentucky Attorney General's Office, arguing that quashing these subpoenas denied him the opportunity to bring the ten audiotapes within the possession of the Commonwealth's Attorney's Office before the court for its review to determine whether the records were properly withheld. Because Appellant was clearly not entitled to such records under the Open Records Act, we hold that the trial court properly quashed the subpoenas.

[R]ecords or information compiled and maintained by county attorneys or Commonwealth's attorneys pertaining to criminal investigations or criminal litiga-

tion shall be exempted from the provisions of KRS 61.870 to 61.884 and *shall remain exempted after enforcement action, including litigation, is completed* or a decision is made to take no action.

KRS 61.878(1)(h) (emphasis added). We interpreted this Open Records Act exemption in *Skaggs v. Redford*, 844 S.W.2d 389 (Ky.1992):

[T]he exemptions in the Open Records Act should be construed in a manner sufficiently broad to protect a legitimate state interest, and ... the state's interest in prosecuting the appellant is not terminated until his sentence has been carried out. The Office of the Commonwealth of [sic] Attorney and the Office of Attorney General, together, represent the state's prosecutorial function in this case.... We agree with the appellee that the records fall within the provisions of [then] KRS 61.878(1)(g), and as such they are "public records exempted under this provision [until] after enforcement action is completed."

*Id.* at 390. These principles apply equally to all records in the litigation files of the Commonwealth's Attorney, regardless of origin. A criminal defendant has ample opportunity to examine the Commonwealth's litigation files before trial. RCr 7.24(2). Appellant cannot use the provisions of the Open Records Act to subvert these rules of discovery. *See* KRS 447.154. As we stated in *Skaggs*, "we disagree that [this result] represents a fundamental unfairness, because the judicial rules of practice and procedure that apply to this case ... require the Commonwealth to make discovery of all information to which the defendant is legitimately entitled during the prosecution of the action." *Skaggs*, 844 S.W.2d at 391. Accordingly, a subpoena requiring representatives from the Attorney General's Of-

fice and the Commonwealth's Attorney's Office to appear at an Open Records Act hearing and produce records in the possession of the Commonwealth's Attorney contravened KRS 61.878(1)(h) and *Skaggs*.

Appellant claims that the subpoenas would have served a second purpose at the hearing by allowing him to introduce evidence that: 1) the subpoenaed individuals had wrongfully interfered with Appellant's open records requests; and 2) that the ten audiotapes in the Commonwealth's Attorney's possession had been wrongfully transferred from the LFUCG to the Commonwealth's Attorney for the purpose of placing them under the *Skaggs* exemption. As stated above, the LFUCG contacted the Attorney General's office and the Commonwealth's Attorney's office after receiving Appellant's June 2000 request. Individuals from those offices advised the LFUCG to deny the request. Appellant claims that this incident constituted wrongful interference with his requests.

This allegation is not at all relevant to Appellant's primary claims for relief, *i.e.*, that additional records exist that he has not received, and that the LFUCG willfully violated the Open Records Act. In light of the LFUCG's July 14, 2000, reconsideration of its denial of Appellant's request, Appellant suffered no harm from these contacts. Further, there is nothing facially improper about representatives of public agencies communicating with one another about open records requests. We decline Appellant's invitation to infer bad faith on the part of these public agencies.

Finally, there is no merit to Appellant's notion that he could have presented evidence to show that ten audiotapes were wrongfully transferred from the LFUCG's possession to the Commonwealth's Attorney's office. Appellant claims that the audiotapes were placed in the custody of the Commonwealth's Attorney only after he began making requests for Earley homicide investigation records. Yet, by Appellant's counsel's own admission, the Commonwealth's Attorney's office provided Appellant with open file discovery at his 1991 trial and furnished him with an inventory of the records in its possession, which included the audiotapes in question. This unrefuted evidence belies Appellant's claim that the LFUCG placed the tapes in the Commonwealth's Attorney's possession to protect them from disclosure under the Open Records Act. Because Appellant's remaining contentions are meritless, the trial court correctly quashed the subpoenas.[3]

### B.  Existence of Additional, Undisclosed Records.

Appellant also contends that the cancellation of the evidentiary hearing denied him an opportunity to present evidence of the existence of additional records which he had not received and which were in the LFUCG's possession. The Open Records Act is silent as to the procedure to be followed when a requester seeks to enforce the Act over a public agency's denial of the record's existence. The Act contemplates that an agency will deny an

---

**3.** Appellant also claims that our case law prohibits a trial court from quashing a subpoena that has the sole purpose of causing a witness to attend and testify at a hearing. This contention is meritless, as a trial court at all times retains the authority to call and excuse subpoenaed witnesses. *See Anderson v. Commonwealth*, 63 S.W.3d 135, 142 (Ky.2001) ("We believe that once subpoenaed, the witness is answerable to the court and can only be excused by the court."); *Otis v. Meade*, 483 S.W.2d 161, 162 (Ky.1972) ("[T]he subpoena created a continuing obligation on his part to be available as a witness until the case was concluded or until he was dismissed by the court."); RCr 7.02(1) ("A subpoena shall be issued by the clerk.").

open records request when it believes that the requested records are exempt, but it does not envision a situation, as here, where the agency claims that the records do not exist. *See* KRS 61.880(1) ("An agency response denying ... inspection of any record shall include a statement of the specific exemption authorizing the withholding of the record ...."). Similarly, the Act's enforcement provisions assume that the parties will be litigating the viability of a claimed exemption over existing records, not the very existence of the records. *See* KRS 61.882(3) ("The court ... may view the records in controversy in camera before reaching a decision.").

■■■■ In construing this legislative enactment, we must view it as a whole, looking to the letter and spirit of the statute. *Combs v. Hubb Coal Corp.*, 934 S.W.2d 250, 252 (Ky.1996). The duty of this Court is "to give effect to the intent of the legislature as contained in the statutory language, considering the evil the law was intended to remedy." *Hearn v. Commonwealth*, 80 S.W.3d 432, 434 (Ky.2002). The General Assembly has expressly declared the "basic policy" of the Open Records Act to be "that free and open examination of records is in the public interest ...." KRS 61.871. When faced with the present situation, the best way to uphold this policy is to ensure that the complaining party has an opportunity to disprove a public agency's denial of the existence of records. The allowance of an opportunity for such a hearing is also in accord with the Act's interrelation with the various statutes governing orderly maintenance and management of public records. KRS 61.8715. To hold otherwise could remove accountability from the open records process, allowing public agencies to avoid judicial review by denying a record's existence altogether rather than claiming a statutory exemption. Statutes must not be construed in a way that they become meaningless or ineffectual. *Commonwealth v. Phon*, 17 S.W.3d 106, 108 (Ky.2000); *Allen v. McClendon*, 967 S.W.2d 1, 3 (Ky.1998).

At the same time, the General Assembly has also evidenced a concern that public agencies not be unreasonably burdened and that essential functions not be disrupted by open records requests. KRS 61.872(6). The unfettered possibility of fishing expeditions for hoped-for but non-existent records would place an undue burden on public agencies. In order to refute a complaining party's claims to a nonexistent record, the agency would essentially have to prove a negative, presumably by presenting evidence of its standards and practices regarding document production and retention, as well as its methods of searching its archives.[4] Therefore, we hold that before a complaining party is entitled to such a hearing, he or she must make a *prima facie* showing that such records do exist.[5]

■■■ On July 8, 2002, Appellant filed a motion to reconsider the cancellation of the evidentiary hearing, supported by affidavits, police reports, and newspaper articles. He claims these documents are sufficient to establish the existence of records

---

4. However, evidence of habit and routine practice is presently inadmissible in Kentucky. *See Burchett v. Commonwealth*, 98 S.W.3d 492 (Ky.2003).

5. KRS 61.882(3), which places the burden of proof in a judicial enforcement action upon the public agency, is inapposite. As stated above, KRS 61.882 contemplates enforcement litigation only over the validity of a public agency's claim of statutory exemption, not over the actual existence of a public record. Where enforcement litigation addresses the latter type of issue, the competing policies articulated by the General Assembly are best served by placing the burden of production on the complaining party.

generated by the LPD, which, despite his requests for all records pertaining to Donald Adams, he never received. According to Appellant, these undisclosed records would contain additional information about the criminal record of Donald Adams and would reveal that Edward Earley had given the LPD information about Adams's past criminal activities.

First, Appellant cites numerous articles from the *Lexington Herald–Leader* newspaper discussing a burglary that purportedly occurred on June 6, 1989, and naming Donald Adams as the victim. Appellant claims that he received no police records regarding the burglary. Because the articles constitute inadmissible hearsay, KRE 802; 1101(b), (d), they are insufficient to establish that the burglary occurred or that records regarding it exist.

Second, Appellant claims he never received any records regarding the suspected drug-dealing activities of Donald Adams prior to Adams's arrest on October 13, 1989, despite his request for all records pertaining to Adams. To prove the existence of such records, Appellant submitted the affidavits of several current and former members of the LPD stating that the Department had received ROIs about Adams's activities before his 1989 arrest, and that this intelligence likely generated ROI files on Adams and his businesses. Nevertheless, these affidavits pertaining to the pre–1989 creation of ROI files are insufficient to establish their present existence. According to the LFUCG's letter to Appellant of July 26, 2000, LPD policy is to routinely purge all ROI files after five years, unless they become part of an active police investigation. Any ROI file that led to Adams's 1989 arrest would have merged with the arrest file, which Appellant received. The affidavits were insufficient to prove the existence of additional unfurnished ROI files on Adams and his businesses.

Third, Appellant claims that records identifying the confidential informant who provided the LPD with information that led to Donald Adams's arrest on October 13, 1989, exist and that he has not received them. In support of this contention, he submitted the affidavit of Harold Winings, the lead officer in the investigation of Adams that led to this arrest. However, in his affidavit, Winings expressed his belief that records concerning informants were not kept in 1989. The affidavit of James Cox, LPD Property and Evidence Section Supervisor, also stated that records concerning informants were not kept at that time. Accordingly, this affidavit is insufficient to establish the existence of records regarding the identity of the confidential informant.

Fourth, Appellant argues that he has not received the full extent of the records detailing the LPD's investigation into the possibility of Adams's involvement in the Earley homicides. In response to his open records requests, Appellant received the written summary of an interview of Adams that was conducted as part of the Earley homicide investigation. It appears from the affidavit of William Henderson, the lead investigator in the Earley homicide investigation, that this was the extent of the investigation into Adams's possible involvement. Under Appellant's questioning, no officer involved in the Earley homicide investigation recalled ever receiving any information indicating that Edward Earley was the confidential informant who provided the tip that led to Adams's 1989 arrest. While it is understandable that Appellant would second-guess an investigation that led to his arrest and conviction, his bare assertion that the LPD "should" have further investigated Adams's possible involvement in the homicides does not es-

tablish the existence of records that he has not already received.[6]

Finally, Appellant claims that records relating to the investigation of an alleged probation violation by Adams exist and were never produced. Appellant submitted a memorandum written to Lexington Police Chief Walsh detailing a confidential informant's allegations that Adams was trafficking in drugs from an automobile repair shop and committing other probation violations. On July 1, 1990, Walsh responded by directing Assistant Chief K.B. Watson to "have this matter investigated and respond with the results." Appellant also submitted affidavits from three former Lexington police officers, each of whom remembered executing a search warrant at the automobile repair shop. It appears from the record of this case that no investigative or enforcement action was taken against Adams after the execution of this search warrant. Thus, it is most likely that any ROI files generated at the time of this incident were purged after five years in accordance with LPD policy.

Appellant obtained extensive sworn testimony from numerous current and former LPD officials concerning information received by the LPD regarding Donald Adams, the extent to which the Earley homicide investigation focused on Adams, and the LPD's document creation and retention policies. Appellant has presented no credible evidence that the LFUCG has failed to comply with the trial court's May 11 and June 19, 2001, orders requiring it to release all non-exempt records "pertaining to anyone named Donald Adams (regardless of middle name or other identifying information)" to Appellant. These orders and the opportunity to submit affidavits taken from Appellant's witnesses provided adequate relief to Appellant; thus, the trial court did not err in denying Appellant an evidentiary hearing to prove the existence of claimed additional unfurnished records.

## II. WILLFUL VIOLATION.

On September 23, 2004, the Fayette Circuit Court concluded that the LFUCG did not violate the Open Records Act. The Act provides, in pertinent part:

> Any person who prevails against any agency in any action in the courts regarding a violation of KRS 61.870 to 61.884 may, upon a finding that the records were willfully withheld in violation of KRS 61.870 to 61.884, be awarded costs, including reasonable attorney's fees, incurred in connection with the legal action.... In addition, it shall be within the discretion of the court to award the person an amount not to exceed twenty-five dollars ($25) for each day that he was denied the right to inspect or copy said public record.

KRS 61.882(5). A public agency's mere refusal to furnish records based on a good faith claim of a statutory exemption, which is later determined to be incorrect, is insufficient to establish a willful violation of the Act. See *Blair v. Hendricks*, 30 S.W.3d 802, 807 (Ky.App.2000), *overruled on other grounds by Lang v. Sapp*, 71 S.W.3d 133, 135–36 (Ky.App.2002). In other words, a technical violation of the Act is not enough; the existence of bad faith is required. The trial court's decision on the issue of willful-

---

**6.** As discussed above, the record in this case contains an affidavit from Lexington Police Chief Walsh, which describes two memoranda, written in 1989 and 1990, concerning information that led to Adams's 1989 arrest and the possibility of Adams being a suspect in the Earley homicides. An affidavit of a computer technician, submitted by the LFUCG, indicates that a thorough search of Walsh's contemporaneous computer files did not produce the documents in question.

ness is a finding of fact and, as such, will not be disturbed unless clearly erroneous. CR 52.01; *Weiand v. Bd. of Tr. of Ky. Ret. Sys.*, 25 S.W.3d 88, 92 (Ky.2000); *Lawson v. Loid*, 896 S.W.2d 1, 3 (Ky.1995).

Appellant's claim of willful violation is based on the LFUCG's denials of his requests for records related to Donald Adams before the trial court ordered the disclosure of such records. On November 3, 1999, the LFUCG agreed to release Donald Adams's records to Appellant, but withheld records generated after April 9, 1990, claiming that such records were part of an ongoing investigation. Appellant continued to make requests for records pertaining to Adams, and his action in the Fayette Circuit Court followed when the LFUCG continued to claim the ongoing-investigation exemption. On May 11, 2001, the Fayette Circuit Court ordered the LFUCG to provide Appellant with all LPD records pertaining to Donald Adams generated between April 10, 1991, and April 10, 1996, and to provide the court with all records generated after April 10, 1996, for *in camera* inspection. After the entry of this order, the LFUCG discontinued its claim to the ongoing-investigation exemption for the records generated after April 10, 1996, and provided Appellant with all records in its possession relating to Adams, with the exception of eight files, which it provided to the court for *in camera* review of its claim of exemption.

Appellant argues that the LFUCG's abandonment of its claim to the ongoing-investigation exemption after the trial court ordered it to produce for *in camera* inspection all records generated after April 10, 1996, reveals that the LFUCG's reliance on this exemption was a sham. We disagree.

> The following public records are excluded from the application of KRS 61.870 to KRS 61.884 and shall be subject to inspection only upon order of a court of competent jurisdiction . . .
>
> . . .
>
> (h) Records of law enforcement agencies . . . that were compiled in the process of detecting and investigating statutory or regulatory violations if the disclosure of the information would harm the agency . . . by premature release of information to be used in a prospective law enforcement action . . . . Unless exempted by other provisions of KRS 61.870 to KRS 61.884, public records exempted under this provision shall be open after enforcement action is completed or a decision is made to take no action . . . .

KRS 61.878(1). We also note that the Open Records Act contemplates exemptions "otherwise provided by law," KRS 61.878, including the following:

> Intelligence and investigative reports maintained by criminal justice agencies are subject to public inspection if prosecution is completed or a determination not to prosecute has been made. However, portions of the records may be withheld from inspection if the inspection would disclose:
>
> . . .
>
> (d) Information contained in the records to be used in a prospective law enforcement action.

KRS 17.150(2). The LFUCG's initial denials of Appellant's request were based on a memorandum issued by the LPD, which concluded after a review of the LPD's intelligence files that release of the requested information would impair an ongoing investigation. The LFUCG relied on this memorandum to claim the exemption provided in KRS 17.150(2)(d) and 61.878(1)(h). The LFUCG abandoned its claim to the exemption only after receiving a second memorandum, over a year and a half after the first, which stated that after engaging in a preliminary investigation of

Adams, the LPD had decided not to commence a formal investigation due to a lack of credible information. Given the passage of time between the two memoranda, this statement is plausible. Thus, even if the trial court concluded that the LFUCG's claim to the ongoing investigation was incorrect, there was no evidence whatsoever to indicate that the claim was in bad faith. We hold that the trial court's finding that the LFUCG did not willfully violate the Open Records Act was not clearly erroneous.

Accordingly, the decision of the Fayette Circuit Court is AFFIRMED.

LAMBERT, C.J.; GRAVES, JOHNSTONE, SCOTT, and WINTERSHEIMER, JJ., sitting.

All concur.