RENDERED:  NOVEMBER 5, 2021; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-0731-MR

AND

NO. 2019-CA-0794-MR

UNIVERSITY OF KENTUCKY                APPELLANT/CROSS-APPELLEE


APPEAL AND CROSS-APPEAL FROM FAYETTE CIRCUIT COURT
v.        HONORABLE KIMBERLY N. BUNNELL, JUDGE
ACTION NO. 16-CI-02241


LACHIN HATEMI, M.D.                APPELLEE/CROSS-APPELLANT


OPINION
REVERSING IN PART AND AFFIRMING IN PART

** ** ** ** **

BEFORE:  ACREE, CALDWELL, AND K. THOMPSON, JUDGES.

ACREE, JUDGE:  The University of Kentucky (UK) seeks appellate review of the

Fayette Circuit Court's opinion and order affirming a decision of the Office of the

Attorney General (AG) that found UK violated the Open Records Act, Kentucky Revised Statutes (KRS) 61.870 *et seq*.

By separate appeal, Dr. Lachin Hatemi requests review of that portion of the same opinion and order dismissing his counterclaim that UK willfully withheld records in violation of KRS 61.882(5).

## INTRODUCTION

The Assistant Attorney General (AAG) assigned to review UK's response to Dr. Lachin Hatemi's Open Records Act request for the production of nonexistent meeting minutes exceeded her authority in conducting that review. The result was an erroneous AG decision in *In re: Lachin Hatemi/University of Kentucky Healthcare Compensation Planning Committee*, Ky. Op. Atty. Gen. 16-ORD-101, 2016 WL 3029663 (May 19, 2016). UK, claiming status as the aggrieved party, invoked the Fayette Circuit Court's subject matter jurisdiction, defined by KRS 61.882(1) only to authorize "jurisdiction to enforce the provisions of KRS 61.870 to 61.884[.]"

The circuit court did not affirm the specific AG finding, nor did it independently find, that UK or any subdivision thereof "violated KRS 61.880(1) . . . when it failed to conduct an adequate search for the minutes." (*Contrast In re: Lachin Hatemi*, 16-ORD-101, at *5 (Record (R.) 52) *with* opinion and order, p. 2 (R. 420-22)). Rather, the circuit court held that a group of UK employees was "a

-2-

'public agency' under the Open Meetings Act . . . required to record and keep meeting minutes under KRS 61.835." (R. 421). Because neither party invoked the circuit court's "jurisdiction to enforce the provisions of KRS 61.805 to 61.850," KRS 61.848(1), the circuit court lacked subject matter jurisdiction to conclude UK violated the Open Meetings Act. "A judgment or order is void where it is entered by a court or agency which lacks . . . subject-matter jurisdiction . . . ." *Puckett v. Cabinet for Health & Fam. Servs.*, 621 S.W.3d 402, 410 (Ky. 2021) (citations omitted). Therefore, this Court must reverse that part of the circuit court's opinion and order.

However, the circuit court acted within its jurisdiction in determining the UK group, and by implication UK itself, did not willfully withhold public records and, therefore, did not violate KRS 61.882(5). We affirm that ruling.

This Court's appellate review requires an understanding of the underlying events, beginning at the beginning.

### THE "COMMITTEE"

The Appellant is the University of Kentucky. But this case is far less about that macro entity than it is about a micro entity known by several names and even generically as both "the committee" and "the group." We begin by determining its genesis. We ask who created it – and, just as importantly, who did not create it – starting with the UK Board of Trustees.

The University of Kentucky Board of Trustees is a public agency with final decision-making authority. *Lexington Herald-Leader Co. v. Univ. of Ky. Presidential Search Comm.*, 732 S.W.2d 884, 886 (Ky. 1987). We know, of course, that "committees appointed by formal action of the University of Kentucky Board of Trustees are public agencies . . . ." *Id.* There is no evidence the Board of Trustees created the group the AG and circuit court determined was a public agency, nor is there any evidence it delegated any authority to the group.

However, we can infer from the retreat minutes of the "University of Kentucky Board of Trustees Healthcare Committee" (R. 21-27) that it – the Healthcare Committee – was "appointed by formal action of the University of Kentucky Board of Trustees" and is also, therefore, a public agency. *Lexington Herald-Leader*, 732 S.W.2d at 886. To be clear, the Healthcare Committee is not the entity deemed a public agency by the circuit court. We must dig further to understand the origin of that deeply embedded entity. We begin by asking whether the Healthcare Committee created it as a subcommittee.

Again, the record is devoid of evidence that the Healthcare Committee created the group. However, Dr. Hatemi cites the Healthcare Committee's minutes from a 2014 retreat to prove otherwise. So, what were those minutes about?

The minutes show, from a presentation by Dr. Michael Karpf,[1] that the Healthcare Committee was authorized to consider a five-year strategic plan, but the Healthcare Committee took no action on the report. (R. 21-22). From a similar presentation by Dr. Colleen Swartz,[2] we know the Healthcare Committee considered, but again took no action on, how well UK medical facilities met community health needs over the previous decade. (R. 22-23). No action was taken after Dr. Susan McDowell's[3] presentation of the "Graduate Medical Education Institutional Review," nor are we told whether she conducted that review alone or with the assistance of a group that likely would have included her co-presenter, Dr. Chipper Griffith, who "reviewed the Rural Physician Leadership Program."[4] (R. 24-25). Dr. Mark Evers presented an update on medical research, emphasizing the need for "enhanced collaboration" among the faculty's researching members. (R. 25-26). That leaves a final presentation reflected in the Healthcare Committee minutes – and it is the focus of Dr. Hatemi's argument.

---

[1] Dr. Karpf was an *ex officio* member of the Board of Trustees Healthcare Committee and Executive Vice President for Health Affairs.

[2] Dr. Swartz was Chief Nursing Officer.

[3] Dr. McDowell was Associate Dean of Graduate Medical Education.

[4] We cannot tell whether the Rural Physician Leadership Program was Dr. Griffith's sole effort or if one or more other individuals assisted him.

-5-

The dean of the medical school was not in attendance at the retreat. (R. 21). The Chair of Internal Medicine filled in and gave an update. This appears to be the only time a faculty member of the "committee," so called, rather than the dean himself directly addressed the Healthcare Committee about the topic. (R. 483). The retreat minutes of the Healthcare Committee reflect that:

> Dr. David Moliterno, Chair for Internal Medicine, presented an update on the Faculty Compensation Planning Committee which seeks to provide fair and equitable compensation for professional activities of physician faculty by incentivizing productivity through, 1) the use of objective measures to reward performance, 2) uncoupling bonuses from departmental fund balances linking instead to overall financials, and 3) standardizing DOE reporting. He reported that between 2011 and 2014 substantial progress has been made to add definition, consistency, and transparency to faculty efforts and compensation. As a result, salaries are more accurate and aligned with national benchmarks. Increasing emphasis will be placed on quality and group success. Ongoing strategies will work to preserve and advance the academic mission.

(R. 27). Like the other presentations, this one was informational and did not result in any action by the Healthcare Committee. Unlike the others, this presentation expressly refers to a "committee." But it does not reveal whether the Healthcare Committee created it. Discovery in circuit court would reveal it did not. In fact, discovery revealed there was little, if any, formality to its creation and existence.

When Dr. Frederick de Beer became dean of the UK College of Medicine in 2011, he and then Vice President of Operations, Rick Lofgren, tapped

into the talent of the existing UK medical school faculty and "called the group of leaders together . . . to help address and advise him [Dean de Beer] of certain matters of the college." (Deposition of David Moliterno, M.D., p. 6 (R. 587)). Those "certain matters" ranged from faculty parking to medical research. (*Id.*, pp. 36-38 (R. 594-95)). Medical faculty compensation was clearly among the matters discussed. (*Id.*, p. 47 (R. 597); Deposition of Clifton M. Iler, p. 24 (R. 616)). Obviously, the collection of faculty leaders who participated pre-existed their utilization as Dean de Beer's advisors. We then must ask whether Dean de Beer gave the group structure, or specific membership, or identified its leaders, or even gave it an official name? The record indicates he did not.

According to Dr. Hatemi's deponents, the assemblage of faculty was more accurately called a "group" because its membership, leader/facilitator, schedule, and even its name changed regularly.[5] (*See generally* Moliterno Deposition *and*, *e.g.*, at p. 5 (R. 587) ("It was a group. I'm not sure it was an official committee, but you can call it that, sure."); Deposition of Marcus Randall, M.D., pp. 4-5 (R. 578-79) ("There is a group – yeah. There is a group in a [sic] meets monthly. It's called – and I don't know that the word 'committee' is used,

---

[5] According to the Chair of the UK College of Medicine Department of Internal Medicine, the group referred variously to its meetings as "chairs meetings," "the chairs and administrators meeting," "a compensation meeting," or "a benefits meeting[,]" depending on the topic discussed when the faculty group convened. (R. 216).

but it's chairs and center directors . . . .")).  Though UK counsel once identified the group's members as 18 department chairs plus appointees from the Kentucky Medical Services Foundation (KMSF),[6] Marcus Randall, M.D., was Chair of the Department of Radiation Medicine at the time and he said he was never a member of a faculty compensation group.  (Randall Deposition, pp. 4, 20 (R. 578, 582)).  In fact, attendance at any particular meeting depended on the topic to be discussed.  (*See, e.g.*, Moliterno Deposition, p. 50 (R. 598) ("It, again, depended on the topics of the agenda.  Sometimes we invited people who were members of neither, I mean, a chair or a KMSF board.  They may have been a department administrator or some – someone else.")).

Even when it comes to the group's name, the record is replete with utter confusion.  (Randall Deposition, p. 5 (R. 579) ("I've heard of something generally called that, yes."); Moliterno Deposition, p. 6 (R. 587) ("You can call it a committee.  I don't mind that.  I was just trying to clarify."); Deposition of Robert S. DiPaola, M.D., pp. 4-5 (R. 601-02) ("what did you call it? . . .  I'm not sure if that's . . . what it was called . . . .")).  Even Dr. Hatemi and the AAG called the

---

[6] Dr. Moliterno agreed that the 18 clinical department chairs were members and, generally, so were some KMSF-related individuals, but he later clarified that "they were in attendance" at meetings but he had no idea who said they should attend.  (Moliterno Deposition, pp. 23-24 (R. 591)).

"committee" by inconsistent names.[7]  The group never had a secretary or "scribe" to take minutes or even notes.  It gathered irregularly, offering the dean recommendations reached by consensus, not by formal vote.  (R. 344-45).  There was "no written document . . . [t]o give to the dean based on" the meetings and, in fact, when asked whether he would summarize every meeting for the dean, Dr. Moliterno responded, "Gosh, not necessarily."  (Moliterno Deposition, pp. 45-46 (R. 597)).  But what about the committee's authority?  Did it have any?

Concluding that no public agency created the "committee" does not eliminate the possibility that the Board of Trustees or the Healthcare Committee delegated some authority to it.  However, the proof does eliminate that possibility.  There is neither direct evidence nor inference-supporting indirect evidence that the "committee" was delegated any final decision-making authority for determining faculty compensation, or for making salary recommendations, or anything else.

Nor is there any evidence that either the Board of Trustees or the Healthcare Committee delegated any such authority to Dean de Beer (a member of neither Board nor Healthcare Committee) who then, in theory, might have re-

---

[7] Dr. Hatemi referred to the group alternately as the "UK Healthcare Faculty Compensation Committee" (*see, e.g.*, R. 9) and the "University of Kentucky Healthcare Compensation Committee" (*see, e.g.*, R. 13).  The AAG had the same difficulty settling on a name, initially calling the group the "UK Healthcare Faculty Compensation Planning Committee," (R. 33), before settling on "University of Kentucky Healthcare Compensation Planning Committee" for the captioning of *In re: Lachin Hatemi*, 16-ORD-101.  (R. 45).  Other than her use of that specific name, it appears nowhere in the record.

delegated the authority to the faculty leaders who advised him. There is not even enough evidence to support speculation to that effect. All proof is to the contrary.

As Dr. Randall explained, "there's a budgeting approval process, and that happens through finance, and I'm sure there's lots of conversations with the dean and the EVPHA [Executive Vice President of Health Affairs] . . . . The UK Board [of Trustees] has the final approval for the budget, and that is where the salaries lie." (Randall Deposition, pp. 14-15 (R. 581)). When pressed, Dr. Randall explained, "As I said, there are multiple people involved in the conversations about what salaries are. The dean would be a part of that conversation, but to say that he has the final approval of salaries would not be an accurate statement. . . . That's – that's just not how it works." (*Id.*, pp. 16-17 (R. 581-82)). Dr. Randall concluded the dean did not even make salary recommendations. Identifying Dr. Karpf as the EVPHA, and Dr. Mark Newman as his successor, Dr. Randall said, "It's their responsibility to present the [medical school] budget to – to the board of trustees." (*Id.*, p. 16 (R. 581)). The UK Board of Trustees retained all such authority.

From the Board of Trustees where faculty compensation is decided, to the Healthcare Committee, to the dean, to the medical faculty leaders advising the dean, makes the so-called "committee" quite remote from the decision-making process. Notably, when the AG undertakes an Open *Meetings* Act review – the kind of review *not* implicated in this case – it determines whether an entity is a

-10-

public agency by asking whether "the work being done . . . is '**too remote** from the decision making process[.]'" *In re: Christopher M. Grande and J. Fox DeMoisey/Univ. of Louisville*, Ky. Op. Atty. Gen. 13-OMD-187, 2013 WL 8360207, at *4 (Nov. 12, 2013) (emphasis original). If it is, the Open Meetings Act will not justify "reach[ing] down through layers of administrative organization to affect the day-to-day administrative work of public employees." *Id.* at *3.

Dr. Hatemi seems to have known little about the nature of the dean's group of faculty advisors. And so, not knowing otherwise than to presume the group kept meeting minutes, he asked to see them.

### THE RECORDS REQUEST AND UK'S RESPONSE

On January 19, 2016, Dr. Hatemi emailed "UK Open Records" requesting the "meeting minutes for UK Healthcare Faculty Compensation Planning Committee[.]" (R. 9). As the public agency to which Dr. Hatemi directed his query, UK assigned its Official Records Custodian to respond. The Official Records Custodian contacted the "Office of the Executive Vice President for Health Affairs" and "asked whether the administrative body kept minutes." (R. 11, 39). We know Dr. Moliterno, as Chair of the Department of Internal Medicine, was also asked about minutes. "I was asked something similar to that, yes[,]" said Dr. Moliterno, "I was asked if I had notes or material, and I said we didn't keep

-11-

notes or minutes." (Moliterno Deposition, p. 16 (R. 589)). He searched his computer for notes and found none. (*Id.*, pp. 16-17 (R. 589-90)).

Compliant with the five-day requirement of KRS 61.880(1), the Records Custodian responded in writing to Dr. Hatemi that the Vice President "advised that there are no documents responsive to your request above." (R. 11). UK thusly "made a good faith effort to conduct a search using methods which [could] reasonably be expected to produce the records requested," the standard established by numerous AG decisions. *See In re: Michael R. Fitzpatrick/City of Frankfort*, Ky. Op. Atty. Gen. 06-ORD-074, 2006 WL 1315772, at *3 (Apr. 4, 2006) (citations omitted); *see also In re: Dr. Bruce M. Tyler/Univ. of Louisville*, Ky. Op. Atty. Gen. 15-ORD-102, 2015 WL 3776345, at *3 (Jun. 8, 2015) (quoting *In re: Bobbi Nelson/Oldham County Fiscal Court*, Ky. Op. Atty. Gen. 12-ORD-065, 2012 WL 1130511 (Mar. 23, 2012) ("We assume a modicum of good faith from both parties to an open records appeal: from the requester in formulating his[/her] request, and from the official custodian in providing the records which satisfy the request.")).

The record before this Court shows the response by UK's Official Records Custodian was complete and accurate. UK fulfilled its KRS 61.880(1) duty. As the AG has often said: "A public agency . . . discharges its duty under the [Open Records] Act in advising that records being sought do not exist

following a reasonable search . . . ." *In re: Lawrence Trageser/Kentucky State Police*, Ky. Op. Atty. Gen. 20-ORD-010, 2020 WL 586689, at \*2 (Jan. 28, 2020).

Dr. Hatemi was unsatisfied with this answer and, on January 25, 2016, he asked the AG to review his Open Records Act request. (R. 13).

## THE NEED TO REVIEW THE ATTORNEY GENERAL OPINION

This Court acknowledges that its review is from "an original action [in circuit court] just . . . 'as if it were an action brought under KRS 61.882.'" *City of Fort Thomas v. Cincinnati Enquirer*, 406 S.W.3d 842, 848 (Ky. 2013) (citing KRS 61.880(5)(a)). Neither the circuit court nor this Court is "in any sense bound by the Attorney General's decision, nor is it limited to the 'record' offered to the Attorney General." *Id.*

However, we are equally aware that when there is an administrative review of an agency's response to an Open Records Act request, the AG decision always sets the stage for judicial review in terms of subject matter and which party pursues it. If flawed, the administrative review potentially sets that stage for the tragedy of judicial error, just as occurred here. The judicial errors in this case – including proceeding while lacking subject matter jurisdiction – are rooted in a flawed administrative review.

Notwithstanding any error by the circuit court, there is no reason to be reluctant to address impropriety when discovered in an AG review. Are we to

-13-

believe that, when the legislature enacted KRS 61.880(5) granting "appeals" from AG decisions, it expected the judiciary to ignore administrative adjudication errors as though they do not matter? We think not.

When a person challenges an agency's decision directly in the courts pursuant to KRS 61.882(2), there is no administrative branch participation or consequent risk of memorializing legal error. But, when a person turns to the AG to confirm his position that an agency violated the law, that administrative decision becomes a part of Kentucky's broader jurisprudence. At the least, it is the courts' responsibility to comment on any legal error by the AG when a KRS 61.880(5)(a) "appeal" comes before it. That is where our analysis must take us in this case.

The administrative aspect of this case became unnecessarily messy because the AAG was misguided. The resulting decision derided UK for failing to produce to Dr. Hatemi meeting minutes before they were created, and for failing to adequately search for records that never existed, making the AAG's decision:

> a one-way ticket to "Topsy-Turvy Land," a place described by Judge Jerome Frank in *Dincher v. Marlin Firearms Co.*, 198 F.2d 821, 823 (2d Cir. 1952), where you "die before you are conceived, or be divorced before ever you marry, or harvest a crop never planted, or burn down a house never built, or miss a train running on a nonexistent railroad."

*Tabler v. Wallace*, 704 S.W.2d 179, 184 (Ky. 1985), *overruled on other grounds by Calloway Cty. Sheriff's Dep't v. Woodall*, 607 S.W.3d 557 (Ky. 2020).

-14-

We sympathize with the circuit court judge who faced the challenge of undoing this Gordian knot. Circuit courts must deal with legal matters as they are presented. Here, the topsy-turvy outcome of the administrative review not only posed pleading challenges for UK, it presented the circuit court with vexing administrative appeal conundrums.

For now, it is enough to say that a properly focused, disciplined, and objective AG review of Dr. Hatemi's Open *Records* Act question would have resulted in a timely decision in UK's favor. Dr. Hatemi, if he so elected, would have had to seek judicial relief – not UK. But, as presented to the circuit court, this appeal was in an entirely different posture because the AAG exceeded her authority, as defined in a long line of AG opinions,[8] by investigating Dr. Hatemi's unripe Open *Meetings* Act claim in search of records known by all not to exist.

---

[8] As well stated by the Attorney General in 1993:

> This Office has consistently recognized that a public agency cannot afford a requester access to records which it does not have, or which do not exist. A request for such documents is moot, and obviously cannot be honored. We have also recognized that the *Attorney General is not empowered to investigate in order to locate documents* which the requesting party maintains exist, but which the public agency states do not exist. As we observed in OAG 86-35, at p. 5:
>
> > This Office is a reviewer of the course of action taken by the public agency and not a finder of documents or possible documents for the party seeking to inspect such documents.
>
> We believe this opinion to be dispositive of the instant appeal.

*In re: Jeanine Howard/Barren River District Health Department*, Ky. Op. Atty. Gen. 93-ORD-10, 1993 WL 761405, at *2 (Jan. 29, 1993) (citations omitted) (emphasis added).

*In re: Lachin Hatemi*, 16-ORD-101, reveals such an apparent lack of objectivity that it smacks of an abuse of power. Our Supreme Court warned that "an increase in the aggregate power of administrative agencies over the recent decades, if left unchecked, invites the ascendance of a fourth branch of government – the regulatory state." *Bullitt Fiscal Court v. Bullitt Cty. Bd. of Health*, 434 S.W.3d 29, 39 (Ky. 2014). That warning applies to the delegation of power by one of state government's three branches, but also to an administrator's improperly motivated wielding of existing power that seems at play in this case.

As the AAG's candor revealed, her frustration with UK's failure to cooperate militated "against resolution of the issues in [UK's] favor." *In re: Lachin Hatemi*, 16-ORD-101, at *3 n.8.[9] But, what was that failure to cooperate?

---

See also, e.g., *In re: WSPD Local 6 News/Office of Marshall Cty. Judge/Executive*, Ky. Op. Atty. Gen. 20-ORD-095, 2020 WL 4037673, at *2 n.4 (Jun. 8, 2020) ("This Office has no authority 'to conduct an investigation in order to locate records whose existence or custody is in dispute[.]' 01-ORD-36, p. 2."); *In re: Ricky Fulcher/McCracken Cty. Jail*, Ky. Op. Atty. Gen. 09-ORD-186, 2009 WL 3837606, at *1 n.1 (Oct. 29, 2009) ("[T]his office is not empowered to gather evidence, interview witnesses, conduct hearings or 'investigate' disputes arising under the Open Records Act."); 1986 Ky. Op. Atty. Gen. 2-202, Ky. OAG 86-35, 1986 WL 222296, at *3 (Jun. 5, 1986) ("There is no provision in the Open Records Act giving this office general investigatory powers. We are neither required nor even authorized to conduct investigations of public agencies to attempt to locate documents which the requesting party maintains exist but which the public agency states do not exist.").

[9] The AAG's footnote from *In re: Lachin Hatemi*, 16-ORD-101, reads:

> Here, we are "frustrated in our statutory review" by the committee's refusal to directly answer our requests for additional documentation as to who makes appointments, the total number of members, and how many appointments are made by KMSF. The committee bears the burden of proving that the committee is or is not a public agency and its failure to do so militates against resolution of the issues

-16-

UK properly refused to cooperate with the AAG's attempt to assist Dr. Hatemi by undertaking an unauthorized investigation of a "non-open records issue." The AAG's frustration was unwarranted, because UK was in the right.

The AAG labeled UK's insistence that she follow the law a "failure to cooperate" and attributed a false equivalence to a different agency's clear misconduct in a prior Open Records Act review decision she herself authored, *In re: Todd County Standard/Cabinet for Health and Family Services*, Ky. Op. Atty. Gen. 11-ORD-074, 2011 WL 2036116 (May 17, 2011). That decision led to *Cabinet for Health and Family Services v. Todd County Standard, Inc.*, which affirmed sanctions against the Cabinet because it refused to respond to the records request, then lied about the records' existence before eventually providing them.

---

in its favor. It "cannot benefit for [sic] intentionally frustrating the Attorney General's review." [*Cabinet for Health and Family Services v.*] *Todd County Standard, Inc.*, [488 S.W.3d 1, 6 (Ky. App. 2015), *as modified* (Mar. 4, 2016).]

One might argue this merely states the obvious – a party's failure to carry the burden of proof "militates against resolution of the issues in its favor." We cannot accept this as a plausible reading. First, whether the "committee" was a public agency was not the issue in the administrative review that should have been asking whether there was reason to believe a known public agency, UK, was not acting in good faith when it said the requested records do not exist, such as a *prima facie* showing they did exist. At best, whether the "committee" was a public agency was a nonjusticiable tangential issue. *See In re: Uriah Pasha/Kentucky State Reformatory*, Ky. Op. Atty. Gen. 11-ORD-118, 2011 WL 3311250, at *1 (Jul. 27, 2011). Second, UK's "statutorily assigned burden of proving that it conducted an adequate search for requested meeting minutes" is found in the AG opinion's lead-off summary. Failure to carry one's burden, of course, militates against a favorable outcome. What could be more patently obvious? If this was the intended meaning, why need it be said at all, whether in a footnote or elsewhere? The footnote accomplishes nothing except to reveal the AAG's frustration and how that frustration affected her decision-making.

488 S.W.3d 1, 3, 4, 10 (Ky. App. 2015), *as modified* (Mar. 4, 2016).  We will address this false equivalence below.  First, however, we consider closely the request for AG review, the legal impact of Dr. Hatemi's failure to establish a *prima facie* showing that the records existed, and the consequences of the AAG's disregard of well-established standards for reviewing claims of Open Records Act violation when the agency responds by stating the requested records do not exist.

### DR. HATEMI'S REQUEST AND THE AAG'S REVIEW

"If a complaining party wishes the Attorney General to review a public agency's denial of a request to inspect a public record, the complaining party shall forward to the Attorney General a copy of the written request and a copy of the written response denying inspection."  KRS 61.880(2)(a).  The rules of administrative review do not address, however, the situation in which requested records never existed.  The judiciary had to cobble a set of rules for that scenario.

"Once a public agency states affirmatively that it does not possess any responsive records, the burden shifts to the requester to present a *prima facie* case that the requested records do exist.  *Bowling v. Lexington-Fayette Urban Cty. Gov't*, 172 S.W.3d 333, 341 (Ky. 2005)."  *In re: Uriah Pasha/Little Sandy Correctional Complex*, Ky. Op. Atty. Gen. 20-ORD-178, 2020 WL 7013579, at *1 (Nov. 19, 2020).  Dr. Hatemi failed to meet the burden of making a *prima facie*

-18-

showing, having offered no evidence that the minutes ever existed. He did not even question the truthfulness of UK's response. (R. 13).

When Dr. Hatemi made no *prima facie* showing, the AAG did not follow the required protocol that would have resulted in a finding for UK. There was plenty to guide her review. When Dr. Hatemi produced "no affirmative evidence, beyond mere assertions" that UK ever created or ever possessed the requested minutes, the AAG should have followed this oft-trodden path:

> [T]his Office does "not have a sufficient basis on which to dispute the agency's representation that no such record [exists]." 09-ORD-214, pp. 3-4; 17-ORD-223. In the absence of the requisite *prima facie* showing, or any facts or evidence to support [Dr. Hatemi's] belief that [UK] possesses responsive records, the Attorney General affirms the denial of his request per *Bowling*. *See also* 12-ORD-030 (affirming denial of request for nonexistent records where appellant did not offer any "irrefutable proof that such [records] were created or still exist"); 18-ORD-126.

*In re: Lawrence Trageser*, 20-ORD-010, at *1; *see also In re: Robert C. Moore/Education and Workforce Development Cabinet*, Ky. Op. Atty. Gen. 19-ORD-225, 2019 WL 6794774, at *3 (Dec. 6, 2019) (emphasis added) ("When . . . a public agency denies that certain records exist, and the record on appeal contains no evidence to refute that contention, *further inquiry is not warranted* absent objective proof to the contrary. 05-ORD-065, pp. 8-9; 14-ORD-077; 19-ORD-188.").

Simply put, "the Open Records Act . . . *only* regulates access to records that are 'prepared, owned, used, in the possession of or retained by a public agency.' KRS 61.870(2)." *In re: Rodney Smith/Kentucky State Penitentiary*, Ky. Op. Atty. Gen. 18-ORD-088, 2018 WL 2084002, at *1 (Apr. 27, 2018) (defining "public record") (emphasis original). Not a scintilla of evidence can be found in this case to refute UK's accurate response to Dr. Hatemi that, in effect, nothing he requested had been "prepared, owned, used, in the possession of or retained by a public agency." *Id.* This should have been a simple administrative review to decide. So, what happened?

## THE AAG STRAYS FROM THE PATH OF A PROPER REVIEW

The AAG had "twenty (20) days, excepting Saturdays, Sundays and legal holidays, [to issue] a written decision stating whether the agency violated provisions of KRS 61.870 to 61.884." KRS 61.880(2)(a). By this Court's calculation and even allowing three business days for mail delivery, the AAG was required to issue a decision not later than February 25, 2016. Had she applied clear precedent to the unrefuted lack of objective evidence for the existence of requested records, this deadline would have been met with ease. Consider the administrative review step-by-step.

Well before the statutory deadline, the entirety of the administrative record necessary for the AAG to conduct a timely review was on her desk: (1) Dr.

Hatemi's request (dated January 19, 2016; R. 9); (2) UK's response (dated January 25, 2016; R. 11, 17); and UK's supplemental response (dated February 4, 2016; R. 29-31).  Proper administrative review is limited to this record, and this Court made that clear in *Todd County Standard, Inc.*, where we said:

> KRS 61.880(2)(a) restricts the Attorney General's review of an open records dispute to a written record consisting of the request and denial. 40 [Kentucky Administrative Regulations] KAR 1:030 Section 2 provides for a supplemental response to be considered in resolving the dispute.  KRS 61.880(2)(c) authorizes the Attorney General to "request additional documentation from the agency for substantiation." None of these provisions permit a hearing on the existence or nonexistence of a public record.

488 S.W.3d at 4.  But Dr. Hatemi submitted additional materials to pique the AAG's interest.  (R. 19-27).  And the AAG's interest was piqued.

Dr. Hatemi took a new tack in his appeal, asserting for the first time that the "UK Healthcare Compensation Planning Committee is a public committee [*i.e.*, 'public agency']" and that "[i]f UK does not have minutes of the committee meetings, . . . UK is violating the Kentucky Open *Meetings* Act . . . ."  (R. 13) (emphasis added).  Legally speaking, this aspersion amounts to nothing more than an unperfected request for an Open Meetings Act review.  As discussed below, this very AAG had previously declined to entertain such an unperfected appeal under identical procedural circumstances.  *In re: J. D. Droddy/City of Bowling Green*, Ky. Op. Atty. Gen. 99-ORD-98, 1999 WL 34760065, at *2 (Jun. 7, 1999).  Her

failure of consistency meant, from that point on, even to the present, the parties and the adjudicators were focused on Dr. Hatemi's unripe claim that the "committee" was a public agency in violation of the Open Meetings Act. They were forced to participate in what amounted to a red herring fishing trip.

Dr. Hatemi's unperfected claim of an Open Meetings Act violation was entitled to no AG consideration. Before one can request an Open Meetings Act review by the AG pursuant to KRS 61.846(2), he must comply with subsection (1) of that statute. KRS 61.846(1). Dr. Hatemi failed to do that.

Specifically, Dr. Hatemi never "submit[ed] a written complaint to the presiding officer of the public agency suspected of the violation of KRS 61.805 to 61.850[, stating] the circumstances which constitute an alleged violation of KRS 61.805 to 61.850 [including failing to create minutes as required by KRS 61.835] and [stating] what the public agency should do to remedy the alleged violation." *Id.* To turn a phrase this AAG herself used before, Dr. Hatemi "leapfrogged over this requirement[.]" *In re: J. D. Droddy*, 99-ORD-98, at *2. But this time, in this case, the AAG ignored Dr. Hatemi's failure to satisfy a statutory predicate and proceeded to investigate his Open Meetings Act violation claim anyway. Presented with similar facts in *In re: J. D. Droddy*, the AAG took the opposite and,

more importantly, correct approach.[10]  In the instant case, however, she investigated the Open Meetings Act claim under the false guise of an Open Records Decision (ORD) matter, hence the number – 16-*ORD*-101.

The AAG did give lip service to her duty to refrain from an Open Meetings Act review in a footnote.  However, in doing so, she treated UK's

---

[10] We should expect the AAG to have taken the proper approach to Dr. Hatemi's mixed request for administrative review under both Acts because she did so in this previous AG Opinion she authored.  It reads, in pertinent part, as follows:

> The questions presented in this appeal arise under both the Open Records and Open Meetings Acts. *However, the appellant, J. D. Droddy, has perfected his appeal under the Open Records Act only*. Accordingly, we confine our review to the question of whether the City of Bowling Green violated the Open Records Act in denying Mr. Droddy's request for records . . . .

> The record before us discloses that Mr. Droddy has not submitted a written complaint to the presiding officer of the City of Bowling Green Board of Commissioners stating the circumstances which constitute the alleged [Open Meetings Act] violation, but *has leapfrogged over this requirement . . . .*

> With respect to Mr. Droddy's request for recordings or minutes . . . *Mr. Harmon* [the records custodian] *advised, generally, that . . . no such records exist.  Having not been presented with an open meetings complaint . . . or an opportunity to respond to such a complaint, we believe that this response was sufficient under the law.*  Mr. Harmon indicated that no minutes or recordings of closed meetings are maintained by the Board of Commissioners and that there are therefore no records which are responsive to his request. Obviously, a public agency cannot afford a requester access to records which do not exist.

99-ORD-98, at *1-3 (footnotes omitted) (emphasis added).  In conducting this review, the AAG did not embark on a mission to find meeting minutes claimed not to exist, nor did she question the public agency's stated reason for not creating minutes – the business of the public agency was conducted during a closed session.  Nor did she ask for more documentation pursuant to KRS 61.880(2)(c) to address Droddy's claim "that unauthorized discussions . . . may have occurred in closed session[,]" *id.* at *1, a potential violation of KRS 61.815 which authorizes closed meetings of public agency's under limited circumstances.

acknowledgement that minutes were never created as a confession of its "past failure" and a "violation" of the Open Meetings Act. In her words:

> This office cannot address the committee's apparent *past failure* to create and maintain minutes, since *this violation* arises under the Open Meetings Act and was not properly presented to the Attorney General.

*In re: Lachin Hatemi*, 16-ORD-101, at *5 n.14 (emphasis added) (R. 52). In addition to contradicting themselves, these words contradict the AAG's deeds. The AAG improperly relied on "this violation" of the Open Meetings Act as a substitute for Dr. Hatemi's failure to make a *prima facie* showing that the minutes existed. The reality is that the AAG punished UK for failing to create minutes, not because it failed to adequately search for them. She also had to disregard the obvious – that UK could search for these nonexistent minutes until Hades freezes over and, still, they never would be found.

When Dr. Hatemi could not establish the mandatory *prima facie* showing, he substituted evidence[11] of what the AAG eventually called "this violation" of the Open Meetings Act. *Id*. Understandably, UK believed it needed to respond to Dr. Hatemi's new charges. UK's general counsel supplemented the

---

[11] In addition to the Healthcare Committee's retreat minutes discussed, *supra*, Dr. Hatemi gave the AAG a screenshot of a UK associate counsel's online biography indicating he "sits on" a committee called by yet another name that appears nowhere else in the record in this precise form, the "UK HealthCare Faculty Compensation Planning Committee." (R. 19).

-24-

Official Records Custodian's response, (R. 29-31), as is permitted by regulation. *Todd County Standard, Inc.*, 488 S.W.3d at 4 (citing 40 KAR 1:030 Section 2).

Dated February 4, 2016, the supplemental response focuses on Dr. Hatemi's demand that UK produce minutes that never existed. It is legally sound.

The supplemental response said UK "made a good faith search for the records and concluded the records do not exist . . . ." (R. 29). UK thus took the position, consistent with numerous AG opinions, that it "met its duty by conducting a good faith search for responsive records. A public agency violates KRS 61.880(1) 'if it fails to advise the requesting party whether the' records exist, *but discharges its duty under the Act in advising that records being sought do not exist following a reasonable search*, and explaining why, if appropriate." *In re: Lawrence Trageser*, 20-ORD-010, at *2 (emphasis added) (citations omitted). As discussed, *infra*, "explaining why" the records do not exist is "appropriate" *only* after the requester makes a *prima facie* showing that the requested records existed at some point in time. Because Dr. Hatemi never made such a showing, UK's explanation exceeded what precedent required.

UK thus expected the AAG to follow precedent and find no violation, thereby prompting the next step in the procedure – Dr. Hatemi's decision whether to initiate a judicial review where he would have the opportunity to make a *prima*

*facie* showing that the minutes he requested do exist. (R. 30). Failing that, his case would be dismissed. Our case law supports UK's expectation.

## JURISPRUDENTIAL BASIS FOR UK'S SUPPLEMENTAL RESPONSE

This approach to addressing requests for nonexistent records that UK outlined goes back at least to *Bowling v. Lexington-Fayette Urban County Government*, *supra*, and UK relied upon and cited this case in its supplemental response. (R. 29). *Bowling* explains how the Open Records Act fails to address the situation in which the requested records are nonexistent, stating:

> The [Open Records] Act . . . does not envision a situation, as here, where the agency claims that the records do not exist. . . . [T]he Act's enforcement provisions assume that the parties will be litigating the viability of a claimed exemption over existing records, not the very existence of the records. *See* KRS 61.882(3) ("The court . . . may view the records in controversy in camera before reaching a decision.").
>
> . . . When faced with the present situation, the best way to uphold this policy [that free and open examination of records is in the public interest] is to ensure that the complaining party has an opportunity to disprove a public agency's denial of the existence of records. The allowance of an opportunity for such a hearing is also in accord with the Act's interrelation with the various statutes governing orderly maintenance and management of public records. KRS 61.8715. To hold otherwise could remove accountability from the open records process, allowing public agencies to avoid judicial review by denying a record's existence altogether rather than claiming a statutory exemption.

172 S.W.3d at 340-41. The Supreme Court then considered the need for a

balanced approach to solve this statutory shortcoming. The Court first stated that

the Open Records Act's statutes:

> must not be construed in a way that they become meaningless or ineffectual. *Commonwealth v. Phon*, 17 S.W.3d 106, 108 (Ky. 2000); *Allen v. McClendon*, 967 S.W.2d 1, 3 (Ky. 1998).

> At the same time, the General Assembly has also evidenced a concern that public agencies not be unreasonably burdened and that essential functions not be disrupted by open records requests. KRS 61.872(6). The unfettered possibility of fishing expeditions for hoped-for but nonexistent records would place an undue burden on public agencies. In order to refute a complaining party's claims to a nonexistent record, the agency would essentially have to prove a negative, presumably by presenting evidence of its standards and practices regarding document production and retention, as well as its methods of searching its archives.

*Id.* at 341 (footnote omitted).

Of course, the difficulty, even impossibility, of proving a negative has

been noted frequently in our jurisprudence. *See, e.g.*, *Motorists Mut. Ins. Co. v.

Hunt*, 549 S.W.2d 845, 847 (Ky. App. 1977) (citation omitted) ("proving a

negative is always difficult and frequently impossible"). "Therefore," said the

Supreme Court, "we hold that before a complaining party is entitled to such a

hearing [to determine whether the requested documents exist], he or she must make

a *prima facie* showing that such records do exist." *Bowling*, 172 S.W.3d at 341.

*Bowling* did not say expressly which arbiter decides whether there has been a *prima facie* showing, but that does not mean there is no answer. The answer exists in our jurisprudence. UK recognized it and pointed it out to the AAG, the circuit court, and this Court.

In communications with the AAG, counsel for UK posited that once the requested agency – in this case UK – satisfies its duty under KRS 61.880(1) by stating the requested records do not exist, the requester must seek judicial review, not administrative review, of his *prima facie* claim to the contrary. (R. 29-31). This is consistent with *Todd County Standard, Inc.*, *supra*, that "[n]one of these provisions [of the Open Meetings Act or regulations promulgated thereunder] permit a hearing [by the AG] on the existence or nonexistence of a public record." 488 S.W.3d at 4. Dr. Hatemi could have claimed the right to such a hearing by initiating an action in circuit court, bypassing the AG, pursuant to KRS 61.882(2), which says: "A person alleging a violation of the provisions of KRS 61.870 to 61.884 shall not have to exhaust his remedies under KRS 61.880 before filing suit in a Circuit Court." When the dispute is whether requested records ever existed, this can be the more expeditious route to resolution.

This is so because *whether* a record exists is a question of fact and the AG "has consistently recognized that 'it is not, in general, within our statutory charge to resolve questions of fact or to otherwise act as a trier of fact.' 09-ORD-

120, p. 4; 12-ORD-110." *In re: Noel Mark Botts/City of Burgin*, Ky. Op. Atty. Gen. 15-ORD-200, 2015 WL 6567569, at *2 (Oct. 22, 2015).  How is it that the AAG deviated from such clear precedent?

## AAG MISAPPROPRIATES AUTHORITY OF KRS 61.880(2)(c)

The AAG, perhaps, is confused by opinions saying what should happen if, unlike Dr. Hatemi, a requester does make a *prima facie* showing as part of his request for AG review.  Although this will not justify the AG's *adjudication* of the disputed fact, it will justify a request for more agency documentation pursuant to KRS 61.880(2)(c) to explain, for example, why or how previously existing records were destroyed, misplaced, or lost.[12]  *See, e.g.*, *In re: Dennis J. Langford/Office of the Governor*, Ky. Op. Atty. Gen. 07-ORD-254, 2007 WL 4357468, at *6 (Dec. 4, 2007) ("In order to satisfy its burden of proof under KRS 61.880(2)(c), a public agency must, at a minimum, document what efforts

---

[12] The instant case does not involve records that once existed but no longer do.  The Attorney General has distinguished such cases, stating:

> If the Cabinet has destroyed, deleted, or simply misplaced responsive records, this would not substantively violate the Open Records Act *per se*, because a public agency cannot afford a requester access to a record that it does not have or that does not exist.  99-ORD-98.  The agency discharges its duty under the Open Records Act by affirmatively so stating.  99-ORD-150.  In general, it is not our duty to investigate in order to locate documents which the public agency states that it does not possess.  In this case, however, the records [shown by the requester's proof to have once existed] may have been lost or improperly destroyed by the Cabinet, which would create a records management issue.

*In re: Sean Herman/Kentucky Labor Cabinet*, Ky. Op. Atty. Gen. 18-ORD-081, 2018 WL 2083996, at *6 (Apr. 24, 2018).  We are not dealing with a records management issue here.

-29-

were made to locate the missing records, or explain by what authority

the records were destroyed.").  That principle of administrative review is proven by

the AG's insistence on its converse, that "[w]hen . . . a public agency denies that

certain records exist, and the record on appeal contains no evidence to refute that

contention, *further inquiry is not warranted*[,]" and no exception is made for use of

KRS 61.880(2)(c) to gather more information.  *In re: Robert C. Moore*, 19-ORD-

225, at *3 (citing *In re: John Fritz/Lexington Fayette Urb. Cty. Gov't*, Ky. Op.

Atty. Gen. 05-ORD-065, 2005 WL 3844444, at *5 (Apr. 12, 2005); *In re: Charon

Anderson/Kentucky Correctional Institution for Women*, Ky. Op. Atty. Gen. 14-

ORD-077, 2014 WL 1696269 (Apr. 15, 2014); *In re: Troy Tyson/Kentucky State

Penitentiary*, Ky. Op. Atty. Gen. 19-ORD-188, 2019 WL 5290792 (Oct. 8, 2019)

(emphasis added)).  To be clear, that is what we mean when we say, "if

appropriate[,]" the agency must "explain[] why" the records do not exist.  *In re:

Lawrence Trageser*, 20-ORD-010, at *2; *see also In re: Robert C. Moore*, 19-

ORD-225, at *3 (citing *Eplion v. Burchett*, 354 S.W.3d 598, 604 (Ky. App. 2011));

*In re: Chris Henson/Newport Police Dep't*, Ky. Op. Atty. Gen. 04-ORD-075, 2004

WL 5162568 (May 17, 2004); *In re: Robert Brown/Graves Cty. Fiscal Court*, Ky.

Op. Atty. Gen. 12-ORD-195, 2012 WL 5461007 (Oct. 23, 2012); *In re: Troy

Tyson*, 19-ORD-188, at *3 (emphasis added) ("[I]n order to satisfy the burden of

justifying its denial per KRS 61.880(2)(c), a public agency must offer a written explanation for the nonexistence of the records *if appropriate*.").

Without Dr. Hatemi's *prima facie* showing, UK was not obligated to offer an explanation why no minutes existed, but it chose to do so anyway. UK's general counsel indicated in the supplemental response that no one perceived the group of faculty advisors who helped the dean any differently than hundreds of other groups that stepped up when tasked or asked by an administrator to help out:

> Dr. Hatemi implies the Open Meeting [sic] Act requires this particular committee to keep minutes. Dr. Hatemi seems to believe the Open Meetings Act applies to every one of the several hundred university committees. Dr. Hatemi is mistaken. In any event, the Attorney General's authority in an Open Records Act appeal is limited to the request and the agency's response; it does not extend to speculation as to alleged non-compliance with other statutes. *See In re: Lowe/Kentucky Personal* [sic] *Cabinet*, 07-ORD-190 (2007) (Stumbo, A.G.); 986 Ky. Op. Att'y. Gen. 2-230 (1986) (Armstrong, A.G.).

(R. 31 n.1). Little logic is needed to conclude from the supplemental response that the minutes Dr. Hatemi sought did not exist and were never created because no one involved perceived the group of faculty advisors to be a public agency required by the Open Meetings Act to create meeting minutes. "[T]he Open Records Act . . . *only* regulates access to records that are 'prepared, owned, used, in the possession of or retained by a public agency.' KRS 61.870(2). *See* 19-ORD-188." *In re: Robert C. Moore*, 19-ORD-225, at *2 (emphasis original). Presuming the various

-31-

people involved even thought about the public-agency question, it would not matter whether they were right or wrong in their answer. The soundness of their reasoning – consciously or otherwise – for not creating minutes is not at issue. Only the existence or nonexistence of minutes ever mattered in this case.

With or without UK's supplemental explanation, "further inquiry [wa]s not warranted" by the circumstances. *Id.* at \*3. This is because the Attorney General "is a reviewer of the course of action taken by a public agency and not a finder of documents. OAG 86-35." *In re: Newsy/Louisville Metro Police Dep't*, Ky. Op. Atty. Gen. 21-ORD-024, 2021 WL 655711, at \*1 (Feb. 9, 2021). Even "[e]vidence of willful concealment of public records, if it exists, cannot properly be reviewed by [the] office" of the Attorney General. *In re: William Douglas Epling, II/Cabinet for Health and Family Servs.*, Ky. Op. Atty. Gen. 11-ORD-056, 2011 WL 1486670, at \*2 (Apr. 13, 2011).

The AAG had before her all she was supposed to consider in conducting a review, and about three weeks to do it. But the AAG's February 25, 2016 deadline came and went, and no one heard from her.[13]

---

[13] Had the AAG needed more time, the AG could have authorized a 30-day extension under KRS 61.880(2)(b), provided there were "unusual circumstances." "'[U]nusual circumstances' means, but only to the extent reasonably necessary to the proper resolution of an appeal:

1. The need to obtain additional documentation from the agency or a copy of the records involved;
2. The need to conduct extensive research on issues of first impression; or

A few weeks later, on March 14, 2016, arrogating the authority of KRS 61.880(2)(c) without the prerequisite *prima facie* showing that the minutes existed, the AAG sent a letter to UK's general counsel seeking an explanation why the minutes did not exist. The letter shows the AAG already presumed the group of faculty members was a public agency. She wanted UK to prove it was not. That is apparent from the circular reasoning of her letter and the faulty logic of compound inferences to support her conclusion that her original presumption was correct – the group was a public agency. Her rationale in the letter was as follows:

(1) *Bowling*, *supra*, says a statute directing a public agency [*i.e.*, the "committee"] to create minutes justifies a presumption they exist;[14]

(2) KRS 61.805(2)(g) broadly defines "public agency";

(3) The AAG will presume the "committee" fits that definition of public agency until UK proves otherwise;

---

3. An unmanageable increase in the number of appeals received by the Attorney General.

KRS 61.880(2)(b). But the AAG did not pursue this course. The 30-day extension did not apply so that when the AAG finally issued *In re: Lachin Hatemi*, 16-ORD-101 on May 19, 2016, it was almost three months later than statutorily required. During the period from February 4 to May 19, 2016, the AAG undertook the unauthorized investigation of Dr. Hatemi's claim of UK's Open Meetings Act violation.

[14] The AAG miscites *Bowling* here. (R. 34). *Bowling* does not so hold. The full quote the AAG uses in her March 14, 2016 letter to UK appears in only one decision by any Kentucky appellate court, published or unpublished, *Todd County Standard, Inc.*, 488 S.W.3d at 4, and it appears there only as part of a quote from 11-ORD-074. The presumption the AAG created in 11-ORD-074 was unnecessary to this Court's decision in *Todd County Standard, Inc.* and is, therefore, dicta. The AAG corrected her error in *In re: Lachin Hatemi*. (R. 47).

-33-

(4) Because the "committee" is presumed a public agency, the "committee" is presumed to have created minutes;

(5) Without proof that the "committee" is not a public agency, the presumption that it created minutes suffices as Dr. Hatemi's *prima facie* showing that the minutes indeed exist, notwithstanding UK's denial they were ever created.

(R. 34).

General counsel for UK responded to the AAG's letter on March 25, 2016. (R. 38-43). Assertive, and perhaps perceivable as aggressive, the supplemental response is legally sound. He said he found it "perplexing" that the AAG requested records in an Open Records Act appeal that could only be relevant in an Open Meetings Act appeal which the AAG clearly could not be conducting. Still, stating UK "wants to remove any doubt about the University's compliance with the Open Meetings Act[,]" UK counsel responded with an explanation why that group of faculty advisors was not a public agency. (R. 40-42). However, the response emphasized the impossibility of producing records that never existed.

Distinguishing this case from *City of Fort Thomas v. Cincinnati Enquirer*, counsel pointed out that UK was not refusing to produce existing records. 406 S.W.3d 842 (Ky. 2013). In such a case, counsel agreed, UK would "bear[] the burden of proof, *id.* [referencing KRS 61.882(3)], and what it must prove is that any decision to withhold responsive records was justified under the Act." *Id.* at 848.

-34-

But this case is different, insisted UK. (R. 39-40). When an agency denies a record's existence, as here, the burden is upon "the requester to present a *prima facie* case that the requested records do exist." *In re: Uriah Pasha/Little Sandy Correctional Complex*, 20-ORD-178, at *1 (citing *Bowling*, 172 S.W.3d at 341). The Supreme Court made that point in *Bowling* and repeated it in *City of Fort Thomas* – the requester must first make his *prima facie* showing that the records, in fact, exist; "*then* the agency may also be called upon to prove that its search was adequate. *Bowling*, 172 S.W.3d at 341." *City of Fort Thomas*, 406 S.W.3d at 848 n.3 (emphasis added). The requester's *prima facie* showing of the requested record's existence is what makes it "appropriate" that the responding agency "explain[] why" the reasonable search for supposedly extant records failed to unearth them. *In re: Lawrence Trageser*, 20-ORD-010, at *2; *see also In re: Robert C. Moore*, 19-ORD-225, at *3 (citing *Eplion*, 354 S.W.3d at 604 (where records once existed or should have existed but no longer exist, the requester is entitled to an explanation why)). If the requester makes a *prima facie* showing to the AG that at some point in time the records existed, and if the responding agency has not yet provided this explanation, the AG "may request additional documentation" for that purpose pursuant to KRS 61.880(2)(c).

However, when the requester fails to make the *prima facie* showing before the AG, as here, the burden never shifts to the agency to do anything

further, nor is there any justification for the AG to utilize KRS 61.880(2)(c) to request more documentation. In a practical sense, what documentation would the AG expect could prove such negatives – *i.e.*, not only that a record does not exist, but also that it never existed because it was never created?

Dr. Hatemi had not met his burden of a *prima facie* showing in his Open Records Act appeal when the AAG, changing her course to match his, improperly imposed upon UK the burden of providing additional documents to defend against the unripe, unperfected Open Meetings Act claim Dr. Hatemi included in his correspondence to the AG. That request disregarded these precedents. The only justiciable issue before the AAG was whether UK violated the Open Records Act, not the Open Meetings Act. *In re: Bryan K. Smeathers/City of Owensboro*, Ky. Op. Atty. Gen. 17-ORD-190, 2017 WL 4325408, at *1 (Sep. 20, 2017) (in Open Records Act appeal, records requester "ha[d] not followed the procedure outlined in KRS 61.846(1)" relating to claims of Open Meetings Act violation; therefore, "allegations that [the public agency] violated provisions of the Open Meetings Act are not currently justiciable[.]").

## **THE AAG'S DECISION**

After considering the matter before her from February to May 2016, the AAG finally issued her decision. The summary shows she began by deciding against UK on the nonjusticiable disputed issue of fact whether the "committee"

was a public agency. Then she ruled that the "committee" she just determined was a public agency "failed to meet its statutorily assigned burden of proving that it conducted an adequate search for requested meeting minutes." (R. 45). That conclusion cannot be supported without rejecting the required presumption that the agency responded with a modicum of good faith. *In re: Dr. Bruce M. Tyler*, 15-ORD-102, at *3. The record justifies the reasonable inference that the AAG believed, with nothing to support such belief, that someone at UK was lying about the existence of minutes. So, how is it then that the result in *In re: Lachin Hatemi* was rationalized?

The AAG challenged UK's argument that *Bowling* and *Todd County Standard, Inc.* establish that the AG cannot investigate whether records exist, that only a court can conduct a hearing to decide that fact question, and, even then, "before a complaining party is entitled to such a hearing, he or she must make a *prima facie* showing that such records do exist." *Bowling*, 172 S.W.3d at 341. As noted above, that is the proper interpretation of the jurisprudence.

The AAG countered UK's position by stating "[c]ounsel, however, ignores the facts and the holding in *Todd County Standard, Inc.*"[15] (R. 46). But

---

[15] The AAG was also the Assistant Attorney General who authored and issued *In re: Todd County Standard*, 11-ORD-074, the opinion of the Attorney General reviewed by this Court in *Todd County Standard, Inc. See* 488 S.W.3d at 3.

the facts of *Todd County Standard, Inc.* are in no small degree different from this case and, by their very contrast, those differences support UK's position.

*Todd County Standard, Inc.* reviewed a newspaper's Open Records Act request for Cabinet for Health and Family Services records relating to the death of a child in the Cabinet's custody. 488 S.W.3d at 2-3. Unlike this case, there was never a question whether the Cabinet was a public agency; nor was there any question that KRS 620.050(12) specifically imposed upon the Cabinet, and only the Cabinet, the duty to create and maintain the type of records the newspaper sought. *Id.* at 4 (quoting 11-ORD-074). That statute "requires the Cabinet 'to conduct an internal review of any case where child abuse or neglect resulted in a child fatality or near fatality' if the Cabinet 'had prior involvement with the child or family.'" *Id.* at 4 (quoting KRS 620.050(12)(b)).[16] "Under these circumstances, the Cabinet was obligated to provide . . . an explanation in its initial denial" why it failed to comply with the statute. *Id*. (quoting *In re: Todd County Standard*, 11-ORD-074). "Failing that," the AAG properly sought "written responses to [her] KRS 61.880(2)(c) inquiries to substantiate [the Cabinet's] position." *Id*.

Those are very different circumstances than this case where the "committee's" status as a public agency is so indeterminate that it remains unresolved even as this Opinion is rendered. If Kentucky jurisprudence is

---

[16] Miscited in the opinion as KRS 620.050(1).

followed, that indeterminate status could not support a presumption that the requested minutes exist. As the Supreme Court explained:

> A presumption has been defined as a rule of law which creates or recognizes a probative relationship between two facts, one of which is proved (the proven fact) and the other of which is unproved (the presumed fact), and which attributes a procedural significance to that relationship. Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 10.00 (3d ed. 1993).

*Magic Coal Co. v. Fox*, 19 S.W.3d 88, 95 (Ky. 2000).

Contrast how the facts of *Todd County Standard, Inc.* do support the presumption that records existed while those of the current case do not. In the former case, the "proven fact" was that the Cabinet was a public agency and the "presumed fact" was that it created records as KRS 620.050(12) directs. The AAG was justified and authorized in utilizing KRS 61.880(2)(c) to request information explaining why the Cabinet, incontrovertibly a public agency (the proven fact), failed to comply with a statute expressly directing creation of the requested records; otherwise, the records' existence could be presumed (the presumed fact). Now, consider the facts of this case.

The AAG had limited information regarding the "committee's" "establishment, membership, and role[.]" (R. 48 n.4). Without evidentiary basis, she presumed: "the College of Medicine" was authorized (presumably by the UK Board of Trustees) to create the "committee"; she presumed Dean de Beer was

-39-

acting on that authority and at the instruction of the College of Medicine when he asked faculty members to advise him; and she presumed the College of Medicine "control[led]" the "committee." *In re: Lachin Hatemi*, 16-ORD-101, at \*3-4 (R. 50). The discovery in the circuit court action not only failed to support these presumptions, it contradicted them.

The rule disfavoring inference upon inference does admit of some exceptions, but its underlying principle is to "condemn inferences that build upon inferences in *an unreasonable manner*." *Luna v. Commonwealth*, 460 S.W.3d 851, 889 (Ky. 2015) (citations omitted). The analytical process followed by the AAG here fails to satisfy that principle. Lacking the authority to *adjudicate* factual disputes, she presumed enough facts to justify her inference that the group of faculty advisors was a public agency, so she could then presume minutes were created as she had in the AG review underlying *Todd County Standard, Inc.* But this case does not compare.

Beyond the significant distinction between the legitimate presumption that a record was created in *Todd County Standard, Inc.* and the illegitimate presumption minutes were created in this case, there are other notable differences. For example, UK promptly and truthfully responded to Dr. Hatemi and to the AAG; the Cabinet in *Todd County Standard, Inc.* did not. 488 S.W.3d at 2, 3. Most importantly, unlike UK, the Cabinet eventually "admitted that it possessed

records" responsive to the request. *Id.* at 4-5, 8 ("It was only after the enforcement action was filed in the circuit court that the Cabinet admitted to even possessing records as to [the child who died]."). Could there have been a set of facts more clearly illustrative of an Open Records Act violation than those in *Todd County Standard, Inc.*?[17] Perhaps, but such facts are incomparable to those in the instant case in which all the proof is that no minutes ever existed. And yet, despite these considerable differences, the AAG decided both cases merit the same holding.

As a second justification for concluding the "committee" was a public agency, the AAG presumed it was like the "advisory committees" found to be public agencies in 13-OMD-012, 13-OMD-037, 13-OMD-040, and 13-OMD-090. (R. 51). This is another false equivalency because each of these AG decisions determined the public agency status of one of four separate University of Louisville (UofL) committees by citing a regulation, the UofL bylaws, and/or the UofL "Redbook" (the university's policy manual) that not only mandated their existence but also set forth their composition, duties, and authority.[18] The facts of

---

[17] Although it did not affect the AAG's decision in 11-ORD-074, "the Cabinet also failed to timely appeal the adverse opinion of the attorney general (11-ORD-074)." *Todd County Standard, Inc.*, 488 S.W.3d at 4. Of course, UK did appeal the decision.

[18] *In re: J. Fox DeMoisey/Univ. of Louisville*, Ky. Op. Atty. Gen. 13-OMD-012, 2013 WL 391574, at *1 (Jan. 16, 2013) ("University of Louisville's Residency Review Committee . . . is an entity mandated by 13 KAR 2:045, Section 13(2)"); *In re: J. Fox DeMoisey/Univ. of Louisville*, Ky. Op. Atty. Gen. 13-OMD-037, 2013 WL 1174438, at *1 (Mar. 12, 2013) ("University of Louisville's Arts and Sciences Student Grievance Committee ('Committee') . . . is established under the bylaws of the College of Arts and Sciences pursuant to the University's

-41-

the instant case have none of those proofs and do not come close to comparison with those UofL-related AG decisions.

When Dr. Hatemi failed to establish a *prima facie* showing at the administrative level, that should have ended the administrative review. Instead, the AAG abandoned her duty to follow longstanding AG guidelines that "further inquiry is not warranted." *In re: Chris Hawkins/Kentucky State Penitentiary*, Ky. Op. Atty. Gen. 18-ORD-204, 2018 WL 5732933, at *2 (Oct. 24, 2018) ("When, as in this case, a public agency has denied that a record exists and credibly explained why, further inquiry is unwarranted."). Instead, she abused her power under KRS 61.880(2)(c) for two unauthorized purposes: (1) to find evidence supporting her conclusion the "committee" was a public agency; and (2) to challenge the credibility of UK's records custodian and others who said no minutes were ever created or ever existed.[19] To be clear, the AAG did not presume the minutes'

procedure manual, known as the 'Redbook.'"); *In re: J. Fox DeMoisey/Univ. of Louisville*, Ky. Op. Atty. Gen. 13-OMD-040, 2013 WL 1174439, at *1 (Mar. 15, 2013) (deciding public agency status of "University of Louisville's Brandeis Law School Academic Grievance Committee ('Committee') . . . the legal issues in this appeal are substantially identical to those we addressed in 12-OMD-140 [in which "[i]t is not disputed that the USGC [University of Louisville's University Student Grievance Committee] is a public agency], 13-OMD-012 [committee required by regulation], and 13-OMD-037 [committee established in university bylaws]."); *In re: Christopher M. Grande/Univ. of Louisville Graduate Student Academic Grievance Committee*, Ky. Op. Atty. Gen. 13-OMD-090, 2013 WL 3133651, at *1-2 (Jun. 13, 2013) (internal quotation marks omitted) (deciding public agency status of "University of Louisville Graduate Student Academic Grievance Committee"; "Here, too, the legal issues are substantially identical to those we addressed in 12-OMD-140 and 13-OMD-037.").

[19] *In re: Missy Staples/Glasgow Electric Plant Bd.*, Ky. Op. Atty. Gen. 17-ORD-049, 2017 WL 1180545, at *2 (Mar. 22, 2017), says the Attorney General "is not statutorily authorized to

-42-

existence by drawing an inference from a proven fact, in the manner explained in *Magic Coal*, *supra*. Rather, she *presumed* sufficient facts to support her conclusion the "committee" was a public agency then, building inference upon inference, *presumed* the "committee" – now presumed to be a "public agency" – created minutes. Then, compounding error upon error, she rejected proof that rebutted her ill-founded presumption of the minutes' existence – the agency's representation that, as a simple matter of fact, no one created minutes even if they were supposed to do so.

"In assessing the adequacy of an agency's search[,] we 'need not go further to test the expertise of the agency, or to question its veracity, when nothing appears to raise the issue of good faith.'" *In re: Robert C. Moore*, 19-ORD-225, at *3 n.3 (quoting *In re: David C. Payne/Univ. of Kentucky*, 95-ORD-96, 1995 WL 455395, at *4 (citing *Weissman v. CIA*, 565 F.2d 692, 697 (D.C. Cir. 1977))). The AAG chose to ignore these restrictions, too.

---

conduct investigations, gather evidence, interview witnesses, etc. in the context of resolving an Open Records Appeal; rather, KRS 61.880(2)(a) specifically requires the Attorney General to 'review the request and denial and issue . . . a written decision stating whether the agency violated provisions of [the Open Records Act].' *See* 09-ORD-186; 12-ORD-065. Accordingly, this office 'makes no finding regarding the actual motivation or credibility of either party,' an issue which is not justiciable in this forum . . . ." (footnotes omitted).

Once this Open Records Act appeal jumped the tracks, it became an independent, unauthorized[20] investigation into the "committee's" status as a public agency. The AAG's decision is revealing, stating candidly: "Our requests for additional information were aimed at determining . . . whether the committee constitutes a public agency for purposes of the . . . Open Meetings Act. If so, . . . the committee was statutorily obligated to" comply with KRS 61.835. (R. 47).

Although the definition of "public agency" is found in both the Open Meetings Act and the Open Records Act, neither the definition nor the group's status as a public agency has any relevance here. The question in this Open Records Act review, or any other where the agency responds that the requested records do not exist, is whether the requester can make a *prima facie* showing to the contrary, not whether a separate Open Meetings Act review might conclude they *should* exist. *In re: J. D. Droddy*, 99-ORD-98, at *1-2. Despite acknowledging that she had little evidence regarding the "committee's" "establishment, membership, and role," (R. 48 n.4), the AAG gave us five pages of legal reasoning to justify her conclusion that the "committee" is a public agency. Although that reasoning is flawed, there is no need to comment further on the AAG's rationale.

---

[20] As noted earlier, Dr. Hatemi never satisfied the statutory predicate to an Open Meetings Act appeal required by KRS 61.846(1). Without that predicate, the AG had no authority to proceed.

With no intention of minimizing our belief in the importance of addressing the AAG's several failings in administering and issuing *In re: Lachin Hatemi*, we leave those behind to address the more important issue of the circuit court's *de novo* review of that administrative decision.

## CIRCUIT COURT ACTION

The off-the-rails AG review created pleading challenges for UK. The two most obvious are these: (1) who had the right to initiate judicial review; and (2) what jurisdiction should be invoked given that *In re: Lachin Hatemi* found both an Open Records Act violation and an Open Meetings Act violation?

### *The parties and standing*

First, did UK have standing to seek judicial review? By statute, "[a] *party* shall have thirty (30) days from the day that the Attorney General renders his or her decision to appeal the decision." KRS 61.880(5)(a) (emphasis added). But the parties identified in the AAG's decision were Dr. Hatemi and "University of Kentucky Healthcare Compensation Planning Committee." (R. 45). Judicial review thus had to start with an irony, and a conundrum UK had to solve.

As thoroughly discussed above, the group the AAG sought to regulate was a voluntary association of faculty members and others who periodically advised the dean. "[V]oluntary associations . . . are not legal entities and in Kentucky they cannot properly sue or be sued as such." *Business Realty, Inc. v.*

-45-

*Noah's Dove Lodge No. 20*, 375 S.W.2d 389, 390 (Ky. 1963), *as modified on denial of reh'g* (Feb. 14, 1964). The irony, of course, is that the entity deemed a public agency by the AAG cannot be recognized by our courts as a legally existing "person" with the capacity to sue. *Id.* As a matter of necessity then, UK claimed the right to appeal in its complaint simply by saying so. However, there was never a controversy regarding UK's standing because Dr. Hatemi agreed UK was a proper party.[21] The more consequential issue does not relate to the parties, but to the circuit court's jurisdiction.

### *Lack of subject matter jurisdiction to determine Open Meetings Act issues*

Kentucky's circuit courts only have subject matter jurisdiction "to review the actions or decisions of administrative agencies" when "authorized by law[,]" KRS 23A.010(4), because "[a]n appeal from an administrative decision is a matter of legislative grace . . . ." *Spencer Cty. Pres., Inc. v. Beacon Hill*, 214 S.W.3d 327, 329 (Ky. App. 2007). Such grace was granted when the legislature authorized circuit courts' "jurisdiction to enforce the provisions of KRS 61.870 to 61.884[.]" KRS 61.882(1).

---

[21] Dr. Hatemi averred that "[a]n actual controversy exists between the parties as to the Committee's obligation to prepare and produce minutes for their meetings." (R. 67). "[L]ack of standing is a defense which must be timely raised or else will be deemed waived." *Harrison v. Leach*, 323 S.W.3d 702, 708 (Ky. 2010).

When UK filed its timely complaint against Dr. Hatemi, it invoked that specific subject matter jurisdiction granted by KRS 61.882(1), and only that jurisdiction. (R. 2). Dr. Hatemi agreed that the action was brought pursuant to that statutory grant. (R. 64). Therefore, the circuit court's subject matter jurisdiction in this case was limited to deciding issues arising in the context of the Open Records Act, specifically, KRS 61.870 to KRS 61.884.

*In re: Lachin Hatemi* held that "the Healthcare Compensation Planning Committee is a 'public agency' within the meaning of KRS 61.805(2)(f) and KRS 61.805(2)(g)[,]" 16-ORD-101, at *4 (R. 51), and effectively found its "failure to create and maintain minutes" to be a "violation" of KRS 61.835. *Id.* at *5 n.14 (R. 52). As discussed above, the AAG had no jurisdiction to address Open Meetings Act violations because Dr. Hatemi failed to comply with KRS 61.846(1).

Similarly, because UK did not invoke the circuit court's jurisdiction pursuant to KRS 61.848(1), the circuit court lacked "jurisdiction to enforce the provisions of KRS 61.805 to 61.850[.]" KRS 61.848(1). That means the circuit court could not decide whether the AAG was correct when she ruled the "committee" was a "public agency" pursuant to KRS 61.805(2) and in violation of KRS 61.835 by failing to create minutes. We must, therefore, declare the circuit court's order void for lack of subject matter jurisdiction to the extent it holds the "Healthcare Compensation Planning Committee is a 'public agency' under the

Open Meetings Act that was required to record and keep meeting minutes under KRS 61.835." (Opinion and Order, p. 2 (R. 421)).

Wrapping up the subject matter jurisdiction question, we note that a reviewing court "succeed[s] to the jurisdiction of the [court from which the appeal is taken] without diminution or enlargement; it has simply that and nothing more as well as nothing less." *Johnson v. Harvey*, 261 Ky. 522, 88 S.W.2d 42, 46 (1935). This Court lacks the same subject matter jurisdiction to decide issues raised before the AG under the Open Meetings Act.

However, that does not end our analysis.

### *Circuit court's finding minutes never existed made "public agency" a moot issue*

We acknowledge the term "public agency" is also defined in the Open Records Act at KRS 61.870(1). However, deciding whether the "committee" was a public agency, presumed to have created minutes, became irrelevant when Dr. Hatemi failed to make a *prima facie* showing of the minutes' existence in circuit court. In the language of our civil procedure rules, Dr. Hatemi was "the party who would be defeated if no evidence were given on either side" to prove the minutes existed. Kentucky Rules of Civil Procedure (CR) 43.01(2).

Consider UK's initial pleading to the circuit court. UK alleged it "had made a good faith search for the records sought by Dr. Hatemi and concluded the

-48-

records did not exist." (R. 3). That was the only issue before the AAG. As recently summarized by the Attorney General:

> When a public agency claims that it has provided all responsive records, this Office has historically declined to make a finding that additional records *should* exist. That is because this Office "is a reviewer of the course of action taken by a public agency and not a finder of documents." OAG 86-35. Moreover, once a public agency states affirmatively that it does not possess any responsive records, the burden shifts to the requester to present a *prima facie* case that the requested records do exist. *Bowling v. Lexington-Fayette Urban Cty. Gov't*, 172 S.W.3d 333, 341 (Ky. 2005). If the requester establishes a *prima facie* case that records do or should exist, "then the agency may also be called upon to prove that its search was adequate." *City of Ft. Thomas v. Cincinnati Enquirer*, 406 S.W.3d 842, 848 n.3 (Ky. 2013) (citing *Bowling*, 172 S.W.3d at 341). Therefore, to support a claim that additional documents exist, the Appellant must produce some evidence that calls into doubt the adequacy of the agency's search. *See, e.g.*, 95-ORD-96.

*In re: Newsy*, 21-ORD-024, at *1 (emphasis added). Resolving whether UK made a good faith search for the minutes Dr. Hatemi requested was within the circuit court's subject matter jurisdiction, and that resolution became much easier when the court concluded the minutes were never created. But let us get back to UK's complaint.

Notwithstanding that UK initiated the judicial proceeding, it was Dr. Hatemi's burden – not UK's – to produce evidence to prove the minutes existed at

some point in time at least.  Again, our Supreme Court made that point clear, stating:

> KRS 61.882(3), which places the burden of proof in a judicial enforcement action upon the public agency, is inapposite.  As stated above, KRS 61.882 contemplates enforcement litigation only over the validity of a public agency's claim of statutory exemption, not over the actual existence of a public record.  *Where enforcement litigation addresses the latter type of issue, the competing policies articulated by the General Assembly are best served by placing the burden of production on the complaining party.*

*Bowling*, 172 S.W.3d at 341 n.5 (emphasis added); *see also* CR 43.01(1) ("The party holding the affirmative of an issue must produce the evidence to prove it.").

As in his administrative appeal, Dr. Hatemi never satisfied his burden in the circuit court of making a *prima facie* showing that the minutes existed.  That means Dr. Hatemi was not even entitled to a hearing on that issue.  *Bowling*, 172 S.W.3d at 341 ("before a complaining party is entitled to such a hearing [to determine the existence of requested records], he or she must make a *prima facie* showing that such records do exist.").  Nevertheless, the circuit court did conduct a hearing and held for UK when it concluded the dean's group of faculty advisors "did not record minutes of its meetings."  (Opinion and Order, p. 2 (R. 421)).

-50-

The circuit court thus agreed with what UK represented from the start – that no records responsive to Dr. Hatemi's request existed because none were ever created. We must think logically about the legal effect of that ruling.

Within the confines of the subject matter – a claim the Open Records Act was violated – it is irrelevant whether KRS 61.835 creates a rebuttable presumption that such records exist. If that presumption ever applied, the unrefuted fact that the minutes never existed rebuts it. That makes the "committee's" public agency status a moot issue. In an Open *Records* Act appeal, the status of the entity that failed to create minutes is irrelevant. What mattered here is that the minutes never existed and, therefore, could never be found no matter how thorough or how diligent the search. Neither Dr. Hatemi nor the AAG could ever legitimately say a more adequate search would have discovered minutes responsive to Dr. Hatemi's request.

The circuit court needed only to ask, "Could any entity, public agency or not, violate KRS 61.880(1) by truthfully reporting that requested records do not exist?" The question answers itself. A statement holding that the "committee" was a public agency was just as unnecessary in the circuit court as it was before the AAG. Being unnecessary to resolution of the case, the holding that the faculty advisors comprised a public agency, even as defined in KRS 61.870(1), constitutes *obiter dictum*. *Harp v. Commonwealth*, 266 S.W.3d 813, 826 n.1 (Ky. 2008)

(Scott, J., concurring in part and dissenting in part) ("Dicta is a statement in an opinion which is unnecessary to the ultimate determination.").

However, addressing the moot question was also legal error. As said long ago by Kentucky's highest court, with equal application today:

> it is a firmly settled rule in this and all other courts that it will not assume jurisdiction to determine abstract or moot questions and thereby consume and appropriate its time in academic discussion, since courts are created for the purpose of trying cases rather than questions.

*Coke v. Shanks*, 218 Ky. 402, 291 S.W. 362, 366 (1927) (quoting *Benton v. Clay*, 192 Ky. 497, 233 S.W. 1041, 1041 (1921)); *see Maze v. Kentucky Judicial Conduct Commission*, 575 S.W.3d 204, 208 (Ky. 2019) (quoting *Benton*, 233 S.W. at 1042), *cert. denied*, 140 S. Ct. 517, 205 L. Ed. 2d 318 (2019).

The Open *Meetings* Act question of whether the "committee" should have created minutes was equally as nonjusticiable and moot in its judicial posture as in its administrative posture. And there is one more reason the question of the "committee's" status is moot. Irrefutably, it ended its existence in 2015 when Dr. de Beer was no longer dean. Therefore, there is no "committee" against which an "injunction or other appropriate order" could provide relief. KRS 61.882(1).

### In re: Lachin Hatemi must be reversed

Whether brought directly to the circuit court pursuant to KRS 61.882 or reviewed first by the Attorney General, the circuit court's review of Open

Records Act issues is undertaken *de novo.*  KRS 61.882(3).  This Court reviews the circuit court's factual findings, if any, for clear error, but we review *de novo* issues concerning the construction or application of the Open Records Act.  *Kentucky New Era, Inc. v. City of Hopkinsville*, 415 S.W.3d 76, 81-82 (Ky. 2013).

The circuit court based its decision to uphold *In re: Lachin Hatemi* on its void ruling that Dean de Beer's group of faculty advisors was a public agency that violated KRS 61.835, stating: "Therefore, the University's request to overrule the Attorney General's decision . . . is DENIED." (R. 421).  The circuit court's affirmation of the AG decision thus lacks the foundation of that void ruling.

On the other hand, the court found as fact that the dean's group of faculty advisors "did not record minutes of its meetings." (R. 421).  That finding is overwhelmingly supported by the evidence.  The established fact that the requested minutes never existed is in direct conflict with the illogic underlying the AG decision which says:  "[W]e find the committee violated KRS 61.880(1) by impeding the timely release of committee meeting minutes when it failed to conduct an adequate search for the minutes" – minutes that never existed.  *In re: Lachin Hatemi*, 16-ORD-101, at *5 (R. 51).  The Attorney General "cannot declare [UK's] failure to produce nonexistent records a violation of the Open Records Act or, as a corollary, compel [UK] to disclose records that were never created[.]" *In*

*re: Keith Cullinan/City of Mockingbird Valley*, Ky. Op. Atty. Gen. 16-ORD-203, 2016 WL 4917032, at *2 (Sep. 7, 2016).

*In re: Lachin Hatemi* must be reversed because the scope of its review exceeded that established by precedent found in Kentucky case law and the Attorney General's own opinions.

## CONCLUSION

### *University of Kentucky v. Lachin Hatemi, No. 2019-CA-0731-MR*

UK brought its appeal, ultimately, pursuant to Section 115 of Kentucky's Constitution and asked that this Court "reverse the [circuit] court's decision finding that the Healthcare Compensation Planning Committee is a 'public agency' under the Open Meetings Act that was required to record and keep minutes under KRS 61.835, and also to reverse the trial court's denial of [UK's] request to overrule the Attorney General's decision . . . ." (UK's Appellant brief, p. 23).

We reverse the circuit court's order to the extent it lacked subject matter jurisdiction to hold the "committee" was a public agency as defined by KRS 61.805(2) and in violation of KRS 61.835. However, any determination by this Court whether the group of faculty advisors who advised Dean de Beer was a public agency pursuant to either KRS 61.805(2) or KRS 61.870(1) would be

unnecessary, moot, or extra-jurisdictional dicta just as it was in the previous

forums this case traversed.  We thus decline to decide that issue.[22]

As to *UK v. Hatemi*, No. 2019-CA-0731-MR, the circuit court's April

2, 2019 opinion and order is reversed, and the Attorney General's opinion

denominated *In re: Lachin Hatemi/University of Kentucky Healthcare*

*Compensation Planning Committee*, Ky. Op. Atty. Gen. 16-ORD-101, 2016 WL

3029663 (May 19, 2016), is reversed.

## *Lachin Hatemi v. University of Kentucky, 2019-CA-0794-MR*

Dr. Hatemi brought his appeal, as did UK, pursuant to Section 115 of

the Kentucky Constitution.  He states the circuit court's "dismissal of Hatemi's

counterclaim alleging the Committee willfully withheld records must be reversed"

because there was insufficient discovery and because the court should not have

---

[22] The Supreme Court said:

> Appellate courts lack subject matter jurisdiction to decide cases that have become moot.  *See Veith v. City of Louisville*, 355 S.W.2d 295, 297-98 (Ky. 1962) (noting that courts do not have the jurisdiction to decide questions that lack justiciable controversies involving the rights of specific parties).  Thus, mootness is a threshold matter for a reviewing court to resolve.  *See Ky. High School Athletic Ass'n v. Edwards,* 256 S.W.3d 1, 4 (Ky. 2008) (holding that this Court is required to address its own subject matter jurisdiction *sua sponte* when necessary).

*Commonwealth, Kentucky Bd. of Nursing v. Sullivan Univ. Sys., Inc.*, 433 S.W.3d 341, 343-44 (Ky. 2014).  The "committee" has not existed for six years.  Even if we ignore the jurisdictional defects in the forums below, whether the "committee" should have created minutes is neither a justiciable nor a remediable controversy.  This Court lacks subject matter jurisdiction for that reason alone.

"accepted a disingenuous defense, that the Committee did not believe it was a public agency . . . ." (Hatemi's Appellant brief, p. 28).

We cannot agree with Dr. Hatemi. The circuit court found the minutes he sought never existed. To hold that nonexistent records were willfully withheld would be an unsupportable incongruity. "When all else is said and done, common sense must not be a stranger in the house of the law." *Cantrell v. Kentucky Unemployment Ins. Comm'n*, 450 S.W.2d 235, 237 (Ky. 1970).

As for *Hatemi v. UK*, No. 2019-CA-0794-MR, we affirm the circuit court's opinion and order dismissing Dr. Hatemi's counterclaim and holding that UK's "failure to produce meeting minutes in response to Dr. Hatemi's . . . Open Records request was not a 'willful withholding' of records under KRS 61.882(5)."

CALDWELL, JUDGE, CONCURS.

THOMPSON, K., JUDGE, CONCURS IN RESULT ONLY.


BRIEFS FOR APPELLANT/
CROSS-APPELLEE:

Joshua M. Salsburey
Donald C. Morgan
William E. Thro
Lexington, Kentucky

BRIEFS FOR APPELLEE/
CROSS-APPELLANT:

Ivey L. Workman
Andre F. Regard
Lexington, Kentucky